107 T.C. No. 18

UNITED STATES TAX COURT

RIGGS NATIONAL CORPORATION & SUBSIDIARIES,
(f.k.a. RIGGS NATIONAL BANK AND SUBSIDIARIES), Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24368-89.                    December 10, 1996.

P regularly made and participated in loans to borrowers located in foreign countries, including Brazil. It was one of hundreds of banks that were involved in the restructuring of Brazil's foreign debt.

As required by Brazilian law, various non-tax-immune Brazilian borrowers paid Brazilian withholding tax on their net loan interest remittances to P during 1980 through 1986. Although the Brazilian Supreme Court had held that, under Article 19 of the Brazilian Constitution, tax-immune Brazilian governmental entities, like the Central Bank, were not liable to pay withholding tax on their net loan interest remittances to foreign lenders, beginning in 1984, the Central Bank purportedly paid withholding tax on its Brazilian restructuring debt interest remittances to P.

On its income tax returns for 1980 through 1986, P claimed a foreign tax credit under sec. 901, I.R.C., for the purported withholding tax payments made by the Central Bank and other Brazilian borrowers on their net loan interest remittances to P.

1. <u>Held</u>: The withholding tax paid by non-tax-immune Brazilian borrowers is potentially creditable to P but must be reduced, under sec. 4.901-2(f)(3)(ii), Temporary Income Tax Regs., 45 Fed. Reg. 75653 (Nov. 17, 1980), and sec. 1.901-2(e)(3)(ii), Income Tax Regs., by the pecuniary benefit the borrowers received from the Brazilian Government. <u>Nissho Iwai Am. Corp. v. Commissioner</u>, 89 T.C. 765 (1987); <u>Norwest Corp. v. Commissioner</u>, T.C. Memo. 1992-282, affd. 69 F.3d 1404 (8th Cir. 1995); <u>Continental Ill. Corp. v. Commissioner</u>, T.C. Memo. 1988-318, affd. without published opinion sub nom. <u>Citizens & S. Corp. & Subs. v. Commissioner</u>, 919 F.2d 1492 (11th Cir. 1990), affd. in part and revd. in part 998 F.2d 513 (7th Cir. 1993), followed.

2. <u>Held</u>, <u>further</u>: P is not legally liable for Brazilian tax on the Brazilian restructuring debt interest remittances it received from the Central Bank. Under Brazilian law, P was not required to pay Brazilian tax, and neither it nor the Central Bank had a legal liability to pay the withholding tax. The purported Central Bank withholding tax payments are not creditable to P because these purported payments were noncompulsory amounts and not a tax to Brazil. Sec. 1.901-2(e)(1), (5), Income Tax Regs.

<u>Joel V. Williamson</u>, <u>Thomas C. Durham</u>, <u>Scott M. Stewart</u>, <u>Richard M. Timmel</u>, <u>Patricia Anne Flaming</u>, and <u>Kim Marie Boylan</u>, for petitioner.

<u>Theodore J. Kletnick</u>, <u>William G. Merkle</u>, <u>Diane P. Thaler</u>, <u>Paul S. Manning</u>, <u>Rajiv Madan</u>, <u>Mary Ann Amodeo</u>, and <u>Janice E. Lamartine</u>, for respondent.

JACOBS, Judge: Respondent determined deficiencies in the Federal income tax of petitioner Riggs National Corporation & Subsidiaries, formerly known as Riggs National Bank and Subsidiaries.

The dispute involves petitioner's entitlement to foreign tax credit under section 901[1] for Brazilian taxes withheld on interest income petitioner received, during the years 1980 through 1986, as a result of its loans to Brazilian borrowers. The primary issues for decision are as follows: (1) Whether petitioner is legally liable for the Brazilian withholding tax purportedly paid by its Brazilian borrowers on their net loan interest remittances to petitioner (the legal liability issue); (2) whether the alleged withholding tax paid by the Banco do Central Brazil (Central Bank) on its Brazilian restructuring debt interest remittances to petitioner is a noncompulsory amount and thus not a tax to Brazil (the Central Bank issue); and (3) whether a subsidy, equal to a percentage of the tax withheld, that borrowers received from the Brazilian Government during the period from January 1, 1980, through June 28, 1985, reduces the amount of foreign tax credit allowable to petitioner (the subsidy/pecuniary benefit issue).

To a major extent, the legal liability and subsidy/pecuniary benefit issues have been previously dealt with in Norwest Corp. v.

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Commissioner, T.C. Memo. 1992-282, affd. 69 F.3d 1404 (8th Cir. 1995); First Chicago Corp. v. Commissioner, T.C. Memo. 1991-44; Continental Ill. Corp. v. Commissioner, T.C. Memo. 1988-318, affd. without published opinion sub nom. Citizens & S. Corp. & Subs. v. Commissioner, 919 F.2d 1492 (11th Cir. 1990), affd. in part and revd. in part 998 F.2d 513 (7th Cir. 1993) and Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765 (1987). However, none of those cases involved withholding tax paid by a tax-immune Brazilian governmental entity/borrower, like the Central Bank here, on its Brazilian restructuring debt interest remittances.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The parties have further stipulated in evidence portions of the trial transcripts in the Continental Illinois and Nissho Iwai cases and various exhibits related to the testimony of certain witnesses in those cases.

A. Background

Petitioner's principal place of business was in Washington, D.C., at the time the petition was filed.

Riggs National Corporation is the parent company of a group of corporations which filed consolidated income tax returns for the years in issue. Its wholly owned subsidiary Riggs National Bank regularly made and participated in loans to borrowers located in foreign countries, including Brazil.

B.  Foreign Loans and the Brazilian Economy in General

In 1974, Brazil incurred a trade deficit of $4.7 billion as a result of higher prices charged for oil due to the energy crisis. At that time, a trade deficit of this size was large for Brazil. After 1974, Brazil greatly increased its reliance on foreign debt. Its foreign debt increased dramatically from 1974 to 1983, and the ratio of Brazil's total foreign debt to its foreign currency reserves grew larger.  The Brazilian Government sought to reduce Brazil's trade deficit by decreasing imports, increasing exports, and encouraging foreign borrowing for internal domestic development.  It hoped to increase the country's productive capacity by stimulating greater investment in steel, oil, pulp and paper, aluminum, petrochemical products, fertilizers, capital goods, and other capital items.

Brazil's currency, the cruzeiro, was not convertible to foreign currency in international markets.  Although the cruzeiro was freely tradeable, as a practical matter, foreign parties outside of Brazil would not accept payment in cruzeiros.

Brazil needed to maintain adequate foreign currency reserves to engage in international trade to finance its trade deficit. During 1974 through 1975, the Brazilian Government sought to maintain a foreign currency reserve of about $6 billion for this purpose.

During 1974, Brazilian borrowers generally were reluctant to take out foreign loans because the Central Bank required a minimum

term for foreign loans which varied from 5 to 12 years. Although the Brazilian Government sought to decrease the effects of inflation through an indexing system, in taking out a long-term foreign loan, a Brazilian borrower incurred a substantial risk that a decline in the exchange rate for the cruzeiro as a result of domestic inflation could increase the cost of the loan.

To increase foreign borrowing, the Brazilian Government provided incentives to Brazilian borrowers in order to overcome their reluctance to take out foreign loans. These incentives included the pecuniary benefit, the Resolution 63 loan program, and the Resolution 432 loan program, all of which are more fully discussed infra.

Until about 1982, lending to Brazilian borrowers was quite profitable for many foreign lenders, including some major U.S. banks. The interest rate spreads (i.e., the interest rate charged on a loan, less the cost of the loan funds to the lender) on Brazilian loans were higher than the interest rate spreads on loans made in many other countries. In addition, the ability to claim foreign tax credits significantly enhanced the after-tax income some foreign lenders derived with respect to their Brazilian loans.

C. Brazilian Regulation of Foreign Lending

Brazil imposes restrictions on the receipt and exchange of foreign currency. By law, all loans from foreign lenders to Brazilian borrowers must be registered with and approved by the Central Bank. Through the registration process, the Central Bank

sets the range of acceptable interest rates and periodically establishes the minimum repayment terms of loans. Once the Central Bank approved a loan, the lender remitted the proceeds in foreign currency to the borrower via a commercial bank in Brazil. The Brazilian bank converted the foreign currency into Brazilian currency by means of an exchange contract, whereby the borrower sold the foreign currency to the bank for Brazilian currency at the official exchange rate periodically set by the Central Bank.

The Brazilian borrower received a Certificate of Registration that enabled the borrower to effect payment of interest and principal in the foreign currency in which the loan was made. On each payment date, the borrower purchased foreign currency from a Brazilian bank at the official exchange rate. The Brazilian bank then tendered the foreign currency to the foreign lender.

D. Payment of the Withholding Tax Generally

Where withholding tax is required, Brazilian law prohibited remittance of an interest payment to a foreign lender without proof of payment of the withholding tax on interest remitted abroad. Under Brazilian law, the borrower initiated payment of the withholding tax by submitting a Documento de Arrecadacao de Receitas Federais (DARF) and the accompanying tax payment to a commercial Brazilian bank. Any bank making an interest payment in foreign currency which was subject to Brazilian tax would require

a completed DARF and payment of the tax as evidence that the proper amount of the tax had been paid.[2]

E. Net Loans and Gross Loans

In making loans to borrowers in Brazil and other countries, it was an accepted and common practice among foreign lenders to require that interest payments be made to them on a "net quoted" basis. A net loan is a loan in which the lender and the borrower have agreed that all specified payments of principal and interest to the lender, under the loan contract, will be made net of any applicable Brazilian taxes.

Under Brazilian law, when the Brazilian borrower under a net loan assumes the burden of the withholding tax, the amount of interest remitted is considered net of tax and an adjustment known as a "gross-up" is required to be made for purposes of computing the withholding tax. This gross-up adjustment would be computed as follows:

$$\text{Grossed-up interest} = \frac{\text{Net interest}}{1 - \text{Withholding tax rate}}$$

---

[2] The borrower prepared the DARF and delivered a copy of it and the registration certificate to the Brazilian bank handling the payment of interest through a foreign exchange contract. The bank recorded the amount of interest and tax on the Certificate of Registration and submitted the certificate, exchange contract, and DARF to the Central Bank for approval. Upon approval by the Central Bank, the bank remitted the interest to the foreign lender and returned to the borrower a stamped copy of the DARF, the Certificate of Registration (stamped), and a copy of the exchange contract. The borrower sent a copy of the DARF to the foreign lender which then had proof (the DARF) that the withholding tax was paid. The lender performed no act in Brazil for the collection of tax.

In contrast to a net loan, a gross loan is a loan in which there is no contractual agreement between the borrower and foreign lender to pay taxes imposed by the borrower's country. With a gross loan, the Brazilian borrower will deduct withholding taxes that are due from the interest specified under the loan contract and will pay the lender the gross interest net of taxes.

From 1970 through 1986, net loans generally were the predominant type of loan extended by foreign lenders to borrowers in Brazil. With a net loan, the foreign lender shifts the risk of any increase in taxes imposed by the borrower's country to the borrower. Correspondingly, in a net loan, the borrower, not the foreign lender, will benefit from any reduction in or waiver of taxes imposed by the borrower's country.

F. Institution of the Subsidy/Pecuniary Benefit

Under Decree-law 1,215, enacted May 4, 1972, the Brazilian Minister of Finance was given discretion to grant a reimbursement or reduction of, or exemption from, the withholding tax on interest provided: (1) The borrower's costs were reduced; (2) the loan was of national interest, (3) the loan met the minimum repayment term set by the National Monetary Council;[3] and (4) the loan complied with other conditions set forth by the Ministry of Finance.

---

[3] The National Monetary Council is a Government agency responsible for economic programs. Its members include the Finance Minister, the Central Bank's President, and representatives of the largest Brazilian commercial banks. The Finance Minister presides over the council's meetings. The council acts through the Central Bank.

Decree-law 1,351, which was enacted on October 24, 1974, authorized the National Monetary Council to temporarily reduce the income tax on interest, commissions, and expenses remitted to persons residing or domiciled abroad. On the same date that Decree-law 1,351 was enacted (October 24, 1974), the Central Bank issued Resolution 305, which temporarily reduced the tax on interest, commissions, and expenses received on currency loans registered with the Central Bank from 25 percent to 5 percent.

Decree-law 1,411, enacted July 31, 1975, amended Decree-law 1,351 and allowed the National Monetary Council to: (1) Reduce the income tax on interest, commissions, and expenses remitted to persons resident or domiciled abroad, or (2) grant pecuniary benefits to Brazilian borrowers receiving loans in foreign currency.

On August 5, 1975, the Central Bank issued Resolution 334, which revoked Resolution 305, thereby reinstating the 25-percent withholding tax on interest, commissions, and expenses paid on currency loans registered with the Central Bank.

G. Mechanics and Amount of the Subsidy/Pecuniary Benefit

On the same day that the 25-percent tax on interest was reinstated (i.e., August 5, 1975), the Central Bank issued Resolution 335, which provided that borrowers taking out foreign loans duly registered with the Central Bank would receive a pecuniary benefit equal to 85 percent of the tax paid on interest, commissions, and expenses due on such loans.

Also on August 5, 1975, the Central Bank issued Circular 266, which provided in part:

> a.   a DARF would be used for the payment of the 25-percent income tax on interest resulting from foreign currency loans;
>
> b.   on the date of payment, the banking establishment receiving the payment would, by means of a credit to the borrower's account, pay the borrower the equivalent of 85 percent of the income tax; and
>
> c. the banking establishment receiving the tax payment would debit its own account entitled "Pecuniary Benefit-D.L. 1,411," and would charge the total value of the pecuniary benefit against the Central Bank.

On July 26, 1979, the pecuniary benefit was reduced to 50 percent of the tax.  On December 7, 1979, the pecuniary benefit was increased to 95 percent of the tax; on May 8, 1980, the pecuniary benefit was reduced to 40 percent of the tax; and on June 28, 1985,[4] the pecuniary benefit was reduced to zero.

H.  Resolution 63 Loans

Many Brazilian companies that needed working capital were not able to provide foreign lenders with adequate financial information or proper guaranties to obtain a loan.  To provide Brazilian companies with the funds needed for their development, and in keeping with the Brazilian Government's efforts to develop the country's economy and generate foreign exchange, the Central Bank issued Resolution 63 on August 21, 1967.  Resolution 63 permitted certain Brazilian banks to borrow funds from abroad for the

---

[4]   The parties have stipulated and agreed to use June 28, 1985, as the date for all purposes relating to the reduction of the subsidy to zero in this case.

specific purpose of relending (repassing) the corresponding borrowed funds in Brazilian currency to Brazilian companies (repass borrowers). The charges paid by a repass borrower to a Brazilian bank were in the same proportion as the charges paid by the Brazilian bank to the foreign lender. The loan between the foreign lender and the Brazilian bank was independent of the loan between the Brazilian bank and the repass borrower. The foreign lender had no legal relationship with the repass borrower and in general did not know the repass borrower's identity.

Foreign loans which were repassed under Resolution 63 were subject to the same restrictions on the receipt and exchange of foreign currency as other foreign loans. Circular 266 provided that in the case of a Resolution 63 loan, the bank receiving the foreign loan was required to transfer the total value of the pecuniary benefit to the borrower receiving the repass funds, and in cases in which the foreign loan was transferred to several repass borrowers, the pecuniary benefit was transferred proportionately to each of such borrowers.

I.  Details of Repass Borrowing Under Resolution 63

Generally, a foreign lender was concerned only with the credit risk of the Brazilian bank. The initiative to borrow foreign funds for lending to local companies under Resolution 63 was that of the Brazilian bank, which would repass loans if and when local borrowers were available. In making Resolution 63 loans to

Brazilian banks, foreign lenders generally assumed that the Brazilian bank would repass its cost of funds (the cost of the foreign lender's loan) and charge a spread or commission to the repass borrower.

The Brazilian bank was allowed to charge its borrower only a repass commission. The repass commission was usually calculated as a set percentage per year of the principal balance of the repass loan. The amount of the repass commission was the same as the commission charged for other types of loans. During the years in issue, there was no limit on repass commissions, and the commission was as high as 10 percent, depending upon the individual repass borrower's credit.

Except for the term of the loan, all other financial conditions of the loan between the Brazilian bank and the repass borrower had to be the same as those between the foreign lender and the Brazilian bank. If the interest rate charged by the foreign lender to the Brazilian bank was net of the Brazilian withholding tax, then the interest rate payable by the repass borrower was likewise net of the Brazilian withholding tax. If the Brazilian bank was entitled to a pecuniary benefit, then it passed on the benefit to the repass borrower. The transfer of the pecuniary benefit from the Brazilian bank to the repass borrower reduced the repass borrower's cost of the repass loan and thus encouraged foreign borrowing.

Beginning in 1974, Resolution 63 funds not utilized in repass operations could be deposited with the Central Bank. When such funds were deposited, the Central Bank paid the interest on the foreign loan; and if there was a net loan involved, no withholding tax was paid with respect to the Central Bank's interest payment.

J.  Resolution 432

As a result of the historically high inflation in Brazil and the periodic currency exchange devaluations, the National Monetary Council issued, on June 23, 1977, Resolution 432, which authorized borrowers of registered foreign currency loans to hedge cruzeiros (intended to be used for payments on the loans) against currency exchange devaluations by depositing foreign funds at the borrower's Brazilian bank. Pursuant to Resolution 432, the borrower would purchase the funds to be deposited at its Brazilian bank at the official exchange rate. The foreign funds remained on deposit until such time as the borrower was required to make payment to the lender. The foreign currency deposited at the borrower's bank was then transferred to the Central Bank which paid (2 days prior to the date the borrower was required to make payment to the lender) interest on the deposited funds at a rate equal to that payable by the Brazilian borrower to the foreign lender (as set forth in the certificate of registration). To the extent that interest was paid to the foreign lender with funds deposited in the Central Bank, the Brazilian borrower had no obligation to withhold income taxes

thereon; correspondingly, the Brazilian borrower received no subsidy.

If the 432 program loan was a gross loan, the Central Bank would pay the withholding tax due on the interest payable to the foreign lender during the period the funds were deposited in the Central Bank. If the 432 program loan was a net loan, the Central Bank would pay no withholding tax with respect to the interest payable to the foreign lender.

K.  Brazilian Tax Law in General

The Brazilian tax system is divided into three types of authority: The Federal Constitution of Brazil (Federal Constitution), the National Tax Code, and ordinary Federal, State, and municipal legislation.[5]

The Federal Constitution divides the authority to tax among the Federal Government, the States, and the municipalities of Brazil. Pursuant to Article 21 of the Federal Constitution, the Federal Government has authority to impose all types of taxes, including a tax on income, except as otherwise granted by the Federal Constitution to the States or municipalities.

---

[5]     The National Tax Code is a complementary law and has an authoritative status below that of the Federal Constitution but above that of ordinary laws. Where the National Tax Code conflicts with an ordinary law, the National Tax Code will prevail.

Article 19 of the Federal Constitution provides that the Federal Government, States, and municipalities are to enjoy immunity from taxation of their income, assets, and operations. Article 19 further extends this immunity from taxation to "autarquias" (i.e., autonomous governmental entities) like the Central Bank.

The National Tax Code establishes the parameters within which the taxing authority of the Federal Government, States, and municipalities may be exercised. It does not, in and of itself, create or impose any taxes.

Article 4 of the National Tax Code specifies that the legal nature of a tax is determined by its generating factor (that is, the taxable event); the name and other formal characteristics of the tax are irrelevant to the legal nature of the tax.

Article 9 of the National Tax Code generally provides that an entity's immunity or exemption from tax will not relieve it of its obligation to collect withholding taxes that are due with respect to its income remittances to third parties.

Article 113 of the National Tax Code divides tax obligations into principal and accessory obligations. The principal obligation is created by the taxable event and has as an objective the payment of tax. The accessory obligation is derived from the tax legislation and has as its objective the performance of specific acts (e.g., maintaining books and records, filing tax returns) in

the interest of collection of tax.  The taxable event which gives rise to the tax on income is the economic or legal availability of such income.

Under Article 45 of the National Tax Code, the person entitled to "the economic or legal availability of income" is called the contribuente, or taxpayer.  However, the status of contribuente can be attributed to the holder of assets producing the income or earnings.  In addition, the source making payment of the income can be liable for the tax if the source is required by law to withhold and pay such tax to the Brazilian Treasury.

Under Article 121 of the National Tax Code, the person obligated to make the payment of tax is called the "passive subject" of the principal obligation.  The passive subject of the principal obligation is either:  (1) The contribuente, when he has a direct and personal relationship with the taxable event or (2) the responsavel (responsible person or person liable) when, without having the status of contribuente, he has an obligation to pay the tax by an express provision of law.

Article 122 of the National Tax Code defines the passive subject of an accessory obligation as the person obligated to perform the duties which make up the accessory obligation.

Article 123 of the National Tax Code specifies that, except as otherwise provided by law, private agreements concerning the liability to pay taxes are not binding on the public treasury.

Article 128 of the National Tax Code provides that the liability for a tax claim may be assigned to a third party who is related to the taxable event which gives rise to the tax obligation.

Since 1943, Brazilian Federal legislation generally has provided for withholding tax imposed on interest paid by Brazilian borrowers to foreign entities, at the following rates:

| Rate | Years |
|------|-------|
| 10% | 1944-47 |
| 15 | 1948-54 |
| 20 | 1955-58 |
| 25 | 1959-74 |
| 5 | 1974-75 |
| 25 | 1975-Present |

Article 11 of Decree-law 401,[6] which was enacted on December 30, 1968, provides as follows:

> Subject to the deduction of the Income Tax at source is the value of interest remitted to a foreign country, payable by virtue of purchase of goods on installment, even when the beneficiary of the revenue is the actual seller.

---

[6] Prior to Decree-law 401, the Brazilian Supreme Court, in several decisions, held that remitted interest with respect to goods purchased abroad on an installment basis could not be taxed, because the interest was part of the purchase price and had been earned abroad. Decree-law 401 was passed to clarify that generally such interest was taxable under Brazilian law. Its provision in Article 11 that the taxable event was the remittance of the interest and the borrower was the contribuente, generated considerable controversy, because that provision seemed contrary to the normal rules of Brazilian tax law. In a June 14, 1972, decision, however, the Brazilian Supreme Court upheld the validity of Decree-law 401.

For purpose of this article, the remittance to a foreign country is considered the generative fact of tax, and the remitter is considered the contribuente.

L.  SRF 368 and FIRCE 80

On June 10, 1980, Secretary Francisco Dornelles (Dornelles), the head of the Brazilian equivalent of the Internal Revenue Service (Brazilian IRS), issued SRF 368 to the head of the Central Bank's Department of Foreign Capital Fiscalization and Registration (FIRCE).  SRF 368 was an "officio", a formal written communication between two governmental agencies that is binding upon the governmental agencies.  SRF 368 stated, in pertinent part:

Subject:  Notification of waiver of payment of income tax on remittances abroad

Ref. Off. Let. FIRCE-1-0-80/059, dated 6/3/80

Dear Sir:

In reply to the above mentioned official letter, of interest to your Department, I hereby inform you, for such measures as you may deem necessary, that, in the exercise of the powers delegated to me by MF Administrative Ruling 648/79, I AUTHORIZE the waiver of payment of withholding income tax incident on the remittance of interest and other legal charges on behalf of Banco do Brasil S/A-Grand Cayman Branch with respect to the foreign loan transaction in the amount of $60 million contracted by the Federative Republic of Brazil, Ministry of Foreign Relations at that bank.

*       *       *       *       *       *       *

2.  I would also like to take this opportunity to inform you of the directive contained in SRF Official Letter no. 1016 dated 12/26/79 addressed to DECAM (Departmento de Cambio) [Department of Foreign Exchange], according to which the Central Bank of Brazil, independently of any prior statements made by this Secratariat, is authorized

to waive the withholding of said tax on remittances abroad made by <u>public-sector entities</u> that prove they have assumed the tax burden [(i.e., have net loans)].

The Brazilian IRS's above position in paragraph 2 of SRF 368 was supported by certain decisions of the Brazilian Supreme Court which held that public-sector entities were not required to pay withholding tax with respect to their net loan interest remittances abroad, because of their immunity from taxation under Article 19 of the Federal Constitution.[7]

As a result of receiving SRF 368, the head of FIRCE issued FIRCE Service Instruction No. 80 (FIRCE 80) on May 19, 1981. FIRCE 80 stated, in pertinent part:

> We hereby inform the Central and Regional Divisions that as per Official Letters SRF no. 368 and DRF (Departmento da Receita Federal) * * * [Brazilian IRS] no. 040/81, dated 6/10/80 and 2/4/81 respectively, the * * * [Brazilian IRS] authorized this bank to waive the payment/collection of withholding income tax in the case of remittances abroad of interest and other charges originating from currency loans and financing for the importing of goods, when the domestic contracting party fulfills the following requirements:
>
> (a) it is a public-sector legal entity;
>
> (b) it has proven that it has assumed the tax burden [(<u>i.e.</u>, has a net loan)];

---

[7] Brazil is a civil law, as opposed to a common law, country. Court decisions are technically binding only upon the litigants of the case. Prior similar cases are not considered to be strictly binding as precedents, although both the courts and litigants will frequently cite such prior cases as representing the correct legal reasoning to be applied and the proper holding to be made.

For purposes of clarification, the following are public-sector entities:

-the Union, States, Federal District, and Municipalities * * * ;

-federal territories * * * ;

-federal, state, and municipal autonomous government agencies * * * .

Consequently, we recommend that, in the case of transactions with the characteristics outlined above, the corresponding Certificates be issued with the additional observation:

"Payment/collection of withholding tax on income is waived on remittance(s) (indicate the nature of the remittance) covered by this Certificate (Official Letter SRF no. 368, dated 6/10/80)."

## M. Latin Debt Crisis

A number of Latin American countries, including Brazil and Mexico, incurred large foreign debts. Beginning in about the early 1980's, some of these countries experienced problems in paying their foreign debts. This Latin debt crisis persisted for a number of years.

In about 1982, a large number of Mexico's foreign lenders (including some major international banks in the G-7 countries) and the Mexican Government agreed to a restructuring of Mexico's foreign debt.

Brazil began experiencing similar problems in paying its foreign debt in 1982. In late 1982, the Brazilian Government declared a moratorium with respect to the repayment of Brazil's foreign debt.

As a practical matter, the major international banks, like Citibank, that held large amounts of outstanding loans in Latin American countries were compelled to help Brazil, Mexico, and other Latin American countries work out their financial problems. These major international banks and the governmental banking regulators in the G-7 countries feared that a default by a Latin American country, especially a major debtor country like Brazil, on its foreign debt could trigger a collapse of the international banking system. The banks and the regulators believed that a default by one Latin American country on its foreign debt could lead to worsening economic conditions which would cause other Latin American countries to default on their foreign debts. For instance, in 1982, Citibank held about $4.6 billion in total outstanding Brazilian loans, an amount equal to an extremely high percentage of Citibank's then net equity. Citibank thus could not afford to write down its Brazilian loans, as such a writedown might lead to its becoming insolvent for bank regulatory accounting purposes.

For its part, Brazil had to obtain considerable financial help from the major international banks in attempting to work out its financial problems. Brazil was desperately short of the foreign currency needed for imports to keep its economy functioning.

N.  Brazilian Foreign Debt Restructuring in General

As relevant to this case, the Brazilian foreign debt restructuring that took place was divided into three phases: Phase I, phase II, and phase III. Initially, the major international

banks involved in negotiating phase I of the Brazilian foreign debt restructuring believed that Brazil's financial problems could be resolved if Brazil were given some relatively short-term financial assistance in overcoming its present shortage of foreign currency, as Brazilian borrowers generally were continuing to make payments in cruzeiros on their foreign loans. In imposing the foreign debt repayment moratorium, the Brazilian Government and the Central Bank were blocking remission of these loan payments because Brazil lacked sufficient foreign currency reserves with which to effectuate the foreign loan payments. This belief of the major international banks proved to be erroneous, and Brazil continued to require yet additional financial assistance from its foreign lenders, including the later phase II and phase III of the Brazilian foreign debt restructuring.

Officials at the highest levels of the Brazilian Government were concerned with and kept informed of the status of the phase I, phase II, and phase III restructuring negotiations. Of the individuals representing the Brazilian Government and the Central Bank during these negotiations (the Brazilians), the principal negotiators were Finance Ministry officials and Central Bank officials.

O. Mechanics and Negotiations of the Brazilian Foreign Debt Restructuring

The Central Bank served as the borrower under certain agreements entered into in connection with phase I, phase II, and

phase III of the Brazilian foreign debt restructuring, with the Brazilian Government being the guarantor of the Central Bank's obligations under these agreements. The major international banks involved in negotiating the Brazilian debt restructuring wanted the Central Bank to be the borrower, as the Central Bank, unlike the Brazilian Government, could be sued in foreign courts. Additionally, the Central Bank held all of Brazil's foreign currency reserves.

There were perhaps as many as 600 foreign lenders holding outstanding Brazilian loans. Collectively, these lenders had issued thousands of outstanding loans to numerous Brazilian borrowers.

As it was not feasible to have the foreign lenders and their Brazilian borrowers renegotiate all these loans, the deposit facility agreement (DFA) mechanism was devised. The prior outstanding loans would be left in place. When a prior loan borrower made a loan payment, the payment would be deposited with and held by the Central Bank pursuant to a new loan entered into by the Central Bank and the foreign lender.

As a further part of the restructuring, Brazil also needed to obtain additional foreign capital to enable its economy to function. Much of this additional foreign capital or new money was furnished under the credit guaranty agreement (CGA) entered into by the Central Bank and some of the foreign lenders. Only the 170 foreign lenders holding the largest amounts of outstanding

Brazilian loans participated in the phase I CGA.  In contrast, almost all of the foreign lenders participated in the phase II CGA.[8]

The loans made to the Central Bank under the phase I and phase II DFA's and CGA's were net loans that had repayment terms of 7 to 9 years.  In the phase I and phase II DFA's and CGA's, provision was made for funds that would otherwise be lent to the Central Bank, as borrower, to be alternatively lent or relent to other Brazilian persons and companies.  Many of the foreign lenders wanted to maintain their business relationships with their longtime Brazilian customers.  They thus wanted their customers to have some ability to borrow and take out loans from the large amount of foreign exchange and capital to be provided by the foreign lenders to the Central Bank pursuant to the DFA's and CGA's.  The phase I DFA, phase II DFA, phase I CGA, and phase II CGA each provided that there would be an initial period of about 16 or 18 months during which DFA and CGA funds could be alternatively lent or relent to other Brazilian persons and companies (the relending period).[9]

<u>Phase I</u>

After the Brazilian Government imposed its foreign debt repayment moratorium in December of 1982, Citibank and Morgan Bank,

_____

[8]    No phase III CGA was entered.

[9]    As part of the later phase III restructuring discussed more fully <u>infra</u>, the relending period for the phase II DFA was extended from June 30, 1985, to April 1986, and the relending period for the phase II CGA was extended from June 30, 1985, to March 1986.

two major international banks holding the largest amounts of outstanding Brazilian loans, took the lead in negotiating the phase I restructuring of Brazil's foreign debt. The phase I restructuring agreements were entered into by Brazil and its foreign lenders on February 25, 1983.

The phase I restructuring included: (1) A phase I DFA that covered the scheduled debt payments due in 1983 on prior outstanding Brazilian loans, (2) a phase I CGA under which the Central Bank would be lent up to an additional $4.4 billion in new money, (3) a phase I trade receivable commitment agreement, and (4) a phase I interbank commitment agreement.[10]

As indicated previously, only the 170 foreign lenders holding the largest amounts of outstanding Brazilian loans participated in the phase I CGA. Their shares of this $4.4 billion of new money to be provided to Brazil were based on their relative holdings of outstanding Brazilian loans.

In negotiating the phase I restructuring, Citibank, Morgan Bank, and the Brazilians were under extreme time pressure to conclude an agreement quickly because of the Brazilian Government's debt repayment moratorium. If a restructuring agreement were not concluded, then many of the foreign lenders' Brazilian loans would

---

[10]     Under the phase I and later phase II trade receivable commitment agreements and interbank commitment agreements the major international banks pledged to provide short-term credit to Brazil in connection with certain trade receivables and interbank lines of credit at the same levels which existed prior to the Brazilian foreign debt crisis.

have to be placed into nonperforming status. (Generally, for bank regulatory accounting purposes, once a bank loan is placed into nonperforming status and a specified period of time elapses, among other things, previously accrued but uncollected interest income with respect to the loan must be written down by the bank. Such writedowns could cause the international financial community to lose confidence in Brazil's ability to repay its foreign debt.) Moreover, if any foreign lender were to declare its outstanding Brazilian loans to be in default, Brazil's foreign debt crisis then could well escalate out of control, with disastrous consequences for a number of major international banks and the international banking system.

### Phase II

During the first half of 1983, Brazil and its foreign lenders realized that the phase I restructuring would not be sufficient to solve Brazil's financial problems. They thus began negotiation of what became known as the phase II restructuring. At about this time, the head of the International Monetary Fund (IMF) announced that he was conditioning Brazil's receipt of any further financial assistance from the IMF upon at least 90 percent of Brazil's outstanding foreign debt that was owed to private foreign lenders being restructured.

On January 27, 1984, Brazil and its foreign lenders entered into four agreements to effectuate the phase II restructuring of Brazil's foreign debt: (1) A phase II DFA that covered the

scheduled debt payments due in 1984 on prior outstanding Brazilian loans, (2) a phase II CGA under which the Central Bank would be lent up to an additional $6.5 billion in new money, (3) a phase II trade receivable commitment agreement, and (4) a phase II interbank commitment agreement.

During the phase II restructuring negotiations, Brazil did not declare another moratorium with respect to the repayment of its foreign debt. As a result, although there was pressure for Brazil and its foreign lenders to conclude a phase II restructuring deal, the time pressure they were under was not as severe as that which they had experienced during the phase I restructuring negotiations.

Many of the foreign lenders were unhappy with Citibank's and Morgan Bank's negotiation of the phase I restructuring. They felt that they had no input into the phase I negotiations and that the phase I restructuring agreements had been forced upon them by Citibank and Morgan Bank.

As a result, the major international banks and Brazil decided that a Bank Advisory Committee for Brazil (BAC) should be formed to negotiate the phase II restructuring on behalf of the foreign lenders. The BAC was formed on June 16, 1983. It had 14 members, Citibank, Morgan Bank, Lloyd's Bank, Arab Banking Corporation, Bank of America, Bank of Montreal, the Bank of Tokyo, Bankers Trust, Chase Manhattan Bank, Chemical Bank, Credit Lyonnais, Deutsche Bank, Manufacturers Hanover Trust, and Union Bank of Switzerland. Citibank served as the BAC's chairman; Morgan Bank and Lloyd's Bank

served as its deputy chairmen.  A senior executive at Citibank, William Rhodes (Rhodes), represented Citibank in its role as the BAC's chairman.

The BAC also appointed certain coordinating banks in various sectors of the international financial community.  The BAC members and coordinating banks would advise foreign lenders of the status of the negotiations.  Also, any foreign lender could raise any issue in connection with the proposed phase II restructuring that it wished with the BAC.

The BAC adopted a set of operating rules concerning its deliberations and its negotiation of the phase II restructuring. The BAC would formulate its position only by reaching a unanimous consensus among the BAC members.  It would further negotiate with the Brazilians only those issues pertaining to the phase II restructuring that it considered to be of importance to all of the foreign lenders, as a group, in effectuating the restructuring; it would not negotiate with the Brazilians those issues that it felt concerned only some of the foreign lenders.  However, on those issues which it would not negotiate, but which it believed were important issues to certain foreign lenders, the BAC would advise the Brazilians of the issue's existence and its importance to some of the foreign lenders.

During the phase II negotiations, perhaps the most contentious issue the BAC dealt with was the issue of new money to be provided to Brazil. Under the proposed phase II CGA, all foreign lenders

holding outstanding Brazilian loans were being asked to contribute their pro rata share of the new money.  However, a number of foreign lenders were reluctant to contribute any new money whatsoever.  The BAC then informed the foreign lenders that, in its negotiation of a phase II restructuring deal on the foreign lenders' behalf, there would be "no free riders".  Although each foreign lender would still have to consent to the terms of any restructuring deal the BAC negotiated on its behalf with the Brazilians, the BAC's official position was that a phase II restructuring would be "all or none".  The BAC feared that if a large number of foreign lenders refused to contribute any new money, its (the BAC's) efforts to conclude a phase II restructuring deal between Brazil and Brazil's foreign lenders might unravel and fail.  While the BAC could not be certain that all of the foreign lenders would ultimately agree to participate, it hoped to obtain as close to 100 percent participation as possible, as any shortfall of new money resulting from some foreign lenders' nonparticipation and refusal to contribute would have to be made up by the other participating foreign lenders.

On October 6, 1983, 60 major international banks agreed on a framework for the phase II restructuring.  Under this framework, Brazil would be provided $6.5 billion in new money.

On October 12, 1983, the BAC issued to the foreign lenders its term sheet with respect to the proposed phase II restructuring.

The term sheet outlined the major terms of the proposed restructuring that the BAC had negotiated with the Brazilians.

From about November 1983 through January 27, 1984, virtually all of the foreign lenders submitted their individual written commitments to the term sheet that the BAC had negotiated on their behalf with the Brazilians. Prior to and during this period, some foreign lenders, including Commercial Credit Corporation, a subsidiary of Control Data Corporation, initially indicated that their approval of the term sheet would be conditional upon the Brazilians' resolving the withholding issue favorably to them, which issue is discussed more fully infra.

Phase III

The phase III negotiations began in about the fall of 1984 and continued through July 1986. Originally, the BAC and the Brazilians contemplated restructuring the scheduled Brazilian foreign debt payments due in the 7-year period from January 1, 1985, through December 31, 1991. However, no such 7-year restructuring agreement was ultimately concluded.

On July 25, 1986, Brazil and its foreign lenders signed the phase III DFA. The phase III DFA covered the scheduled Brazilian foreign debt payments due in 1985 and 1986. Under the phase III DFA, any 1985 debt payments would be available for relending to other Brazilian persons and companies during a specified relending period; 1986 debt payments, on the other hand, would not be available for relending.

The phase I DFA and the phase II DFA did not cover foreign debt payments that were due after January 1, 1985. During the phase III negotiations, Brazil and its foreign lenders agreed to about six interim loan arrangements under which debt payments due after January 1, 1985, being made by Brazilian borrowers would be held by the Central Bank as "interim deposits". These interim arrangements required the Central Bank to pay the foreign lenders interest on such interim deposits, on a "net quoted" basis. The interim arrangements themselves did not provide for any relending period, as the Brazilians and the BAC envisioned that these interim deposits would ultimately be rolled over into and covered under the phase III DFA they anticipated would be concluded.

P. Various Foreign Lenders' Efforts During the Phase I and Phase II Restructuring Negotiations To Have the Central Bank Issue Them DARF's With Respect to Its Net Loan Interest Remittances

For certain U.S. and other foreign lenders who were in a position to claim and utilize them, foreign tax credits potentially represented a significant further source of tax benefits, with respect to their Brazilian loans. Although, in the case of a net loan, the U.S. lender would have to pay U.S. income tax with respect to the additional interest income resulting from the gross-up, a foreign tax credit equal in amount to the additional interest income could be utilized to reduce the lender's U.S. income tax liability on a dollar-for-dollar basis.[11]

_____

[11] See Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765, 772-773 (1987).

As indicated previously, the Central Bank paid withholding tax on its gross loan interest remittances abroad, but not on its net loan interest remittances, including its Resolution 432 loan program net loan interest remittances. Prior to 1982, some foreign lenders, including certain major international banks, like Citibank, sought to have the Central Bank pay withholding tax and issue them DARF's with respect to the Central Bank's 432 loan program net loan interest remittances, as this would enable these foreign lenders to claim potential foreign tax credits. However, their efforts were unsuccessful, as officials at the Central Bank rejected the foreign lenders' requests to have the Central Bank issue such DARF's to them. Central Bank officials advised the foreign lenders that the Central Bank was not required to pay withholding tax with respect to its net loan interest remittances abroad because it was a tax-immune governmental entity under the Brazilian Constitution.

At about the time of the negotiation of the phase I Brazilian debt restructuring, a number of foreign lenders (including some major international banks, like Citibank) intensified their efforts to have the Central Bank issue DARF's on its net loan interest remittances to them, including DARF's with respect to (1) the Central Bank's 432 loan program net loan interest remittances and (2) the Central Bank's proposed phase I DFA and phase I CGA interest remittances (the withholding issue). These intensified efforts by the foreign lenders to have the Central Bank issue them

such DARF's continued until about the time the phase II restructuring agreements between Brazil and its foreign lenders were entered into in late January 1984.[12]

During the phase I negotiations, the Brazilians indicated that they would have the Central Bank issue DARF's to the foreign lenders on the Central Bank's restructuring debt interest remittances on some limited basis, but they also indicated that they needed additional time in which to study and arrange for the implementation of the Central Bank's payment of such withholding tax.[13] On or about December 28, 1982, the Central Bank requested a ruling from the Brazilian IRS with respect to its payment of withholding tax during the relending periods of the proposed phase I DFA and phase I CGA. The ruling request and the March 1984

---

[12] Alexandre Leite (Leite), the head of Citibank-Brazil's tax division, testified that he and Citibank had been seeking DARF's from the Central Bank on 432 program net loan interest remittances since at least 1979. Leite related that the Central Bank officials he met with rejected Citibank's request to have the Central Bank issue such DARF's to it. Following the Central Bank's issuance of FIRCE 80 in May 1981, Leite had concluded that Citibank would not be able to persuade the Central Bank to issue such DARF's, as FIRCE 80 was authorized and sanctioned by SRF 368.

[13] The parties disagree over whether the Central Bank was legally liable for and actually paid withholding tax with respect to its restructuring debt interest remittances during the relending periods of the DFA's and CGA's. The terms "payment" and "withholding tax" are used herein for convenience and are not intended as ultimate findings or conclusions concerning the Central Bank's liability for and payment of such withholding tax. Similarly, the use herein of terms indicating that DARF's or withholding receipts were issued by the Central Bank to the foreign lenders should not be construed as our conveying any legal conclusion concerning the Central Bank's liability for and payment of such withholding tax.

private ruling that ultimately was issued by the Brazilian IRS to the Central Bank are discussed more fully infra.

During the phase II negotiations, some foreign lenders, including Citibank, wanted the BAC to negotiate the withholding issue with the Brazilians. The BAC decided that it could not negotiate the withholding issue with the Brazilians, as the withholding issue, although important to a number of foreign lenders, did not concern all of the foreign lenders.[14] Even those BAC members, like Citibank and Lloyd's Bank, that would substantially benefit from being able to claim potential foreign tax credits realized that they could not afford to be accused of using their positions on the BAC to further their own individual interests at the expense of other foreign lenders.[15] The BAC, instead, advised the Brazilians that the withholding issue was a very important issue to a number of foreign banks, and that the Brazilians would have to resolve the withholding issue as a matter of the applicable Brazilian law. The BAC further created a subcommittee to study the withholding issue.

---

[14]    Some foreign lenders operated in countries which did not allow foreign tax credits with respect to Brazilian withholding tax payments. Still other lenders were not in a tax position to benefit from claiming potential foreign tax credits.

[15]    To a significant extent, Citibank sought to segregate the activities and functions of Rhodes (the Citibank senior executive who acted as the BAC's chairman) from the individual concerns and matters which Citibank pursued during the phase II restructuring negotiations. At various BAC meetings, other Citibank employees (principally the top employees of Citibank-Brazil), and not Rhodes, would represent and present Citibank's position.

Until about the signing of the phase II restructuring agreements in January 1984, Citibank continued to press the Brazilians to reach a favorable resolution of the withholding issue. Top employees of Citibank-Brazil utilized virtually every opportunity available to them, outside of the BAC's meetings, to lobby Brazilian Government officials and Central Bank officials on the withholding issue.[16] Other foreign lenders, including Commercial Credit Corporation, also pressed the Brazilians to resolve the withholding issue favorably to these foreign lenders.

On December 8, 1983, Citibank's in-house tax counsel met with the general counsel of the Central Bank and presented Citibank's position on the withholding issue. During the meeting, the Central Bank's general counsel indicated that DARF's would be issued by the Central Bank on its restructuring debt interest remittances but refused to address whether the Central Bank would issue DARF's on its 432 loan program net loan interest remittances.[17]

On January 22, 1984, the Brazilian Planning Minister, the Central Bank's general counsel, and other Brazilian officials met

---

[16] Job Maats, who functioned as Citibank-Brazil's financial controller, served on the BAC's withholding issue subcommittee and played a central role in Citibank's efforts to obtain DARF's from the Central Bank, testified that Brazilian officials were told that a favorable resolution of the withholding issue would also benefit Brazil and be in Brazil's interest, because it would improve the climate to conclude a restructuring deal.

[17] Citibank estimated that, for 1979 through 1983, a potential foreign tax credit of $30 million could be claimed by Citibank with respect to the Central Bank's 432 program net loan interest remittances.

with Rhodes (the Citibank senior executive who functioned as the BAC's chairman) and certain other BAC members to advise the BAC with respect to how the Brazilians had decided to resolve the withholding issue. During the meeting, the Planning Minister initially asked the Central Bank's general counsel to review and discuss the generally applicable Brazilian law with respect to the payment of withholding tax on interest remittances made abroad. The Planning Minister then telephoned the Brazilian Finance Minister to find out whether the applicable Brazilian law had been clarified with respect to the Central Bank's payment of withholding tax on its restructuring debt interest remittances. He learned that the Brazilian IRS would issue a ruling to the Central Bank, which would hold that the Central Bank was required to withhold on interest remittances during the relending periods of the phase I DFA, phase II DFA, phase I CGA, and phase II CGA, beginning January 1, 1984.[18] The Planning Minister advised Rhodes and the other BAC members of this anticipated ruling. He indicated that the Finance Ministry would shortly send a telex to the BAC confirming this, which telex was received by Rhodes on or about January 24, 1984. This anticipated ruling discussed at the January 22, 1984, meeting

---

[18] The foreign lenders who were seeking DARF's from the Central Bank wanted to receive DARF's with respect to the 1983 restructuring debt interest payments made to them. In addition to enabling them to claim potential foreign tax credits for 1983, they believed that the Internal Revenue Service was more likely to challenge the foreign tax credits claimed by them with respect to the 1984 restructuring debt interest payments if no similar foreign tax credits had been claimed by them for 1983.

was the March 1984 private ruling that the Brazilian IRS ultimately issued to the Central Bank, which ruling is more fully discussed below.

Notes of the January 22, 1984, meeting taken by the lead attorney of the law firm that served as the BAC's counsel, stated:

Rhodes

(1) Banks think 83 will be solved.
(2) IRS won't accept 84 if don't get 83.
(3) negative feeling for banks in the future.

Sobreira [Central Bank's general counsel]

(1) Tax owed by anyone paying interest or fees abroad.
(2) Authority that remits charged with deduction & paying.
(3) Cent Bk agrees to pay on acct of Banks.
(4) Only way CB can pay is if law is interpreted to require payment. Interpretation is from Treasury which has issued the interpretation.
(5) Treasury legal opinion applies to 1984 but not to 1983.

Waiting for      XXXXXX

(1) Delfim [the Brazilian Planning Minister] says decree will be solved by inserting limit.

(2) Wh tax. Phase I and phase II from 1/1/84 on during reborrowing period.

➜    Agreement of Delfim.

Rhodes + Coleman [the Morgan Bank senior executive who functioned as the BAC's deputy chairman] accept #1.
Rhodes says he can't guarantee Bank acceptance of #2.

Q.  The Brazilian IRS's March 1984 Private Ruling to the Central Bank

On or about December 28, 1982, the head of FIRCE submitted a "consulta" or ruling request by the Central Bank to the Brazilian IRS.  The December 28, 1982, consulta stated, in pertinent part:

Subject:  Withholding tax levied on interest on

*  *  *  [proposed phase I DFA and phase I CGA].


Mr. Secretary,

In the next few days, the Central Bank of Brazil will enter into, with the international financial community, *  *  *  [the proposed phase I DFA and phase I CGA].

*        *        *        *        *        *        *

2.    In contracting these  *  *  *  [agreements], the Central Bank  *  *  *  will act in the capacity of Agent of the Federal Government in implementing the foreign exchange policy determined by the National Monetary Council.

3.    Therefore, all the financing charges resulting from the above agreements will be for the account of the National Treasury, which will be responsible for the respective services related to payments and remittances.

4.    During the negotiations for such Agreements, the Brazilian Authorities assumed the commitment to provide the creditors with withholding receipts (DARF's) for the withholding tax paid on the interest payable by the Central Bank on the funds of  *  *  *  [the phase I DFA and phase I CGA], during the period in which such funds remain deposited at the Central Bank and available for relending to borrowers in Brazil.

5.    In view of the special characteristics of these transactions, we hereby request your opinion on the matter, pointing out that the following has already been negotiated with the creditor bankers:

    (a)  issuance of the DARF's in the names of
    the agent bank of  *   *   *  [the proposed
    phase I DFA and phase I CGA], considering that

the large number of lender bankers makes it impractical to issue one DARF in the name of each of them;

(b) the payments are to be made individually per agent/taxable event/tax rate in view of the different tax rates available under double-taxation treaties.

6. In view of the foregoing, we hereby ask also for your opinion regarding the following aspects:

(a) if the Central Bank, in this case, is entitled to the pecuniary benefit * * * ;

(b) the possibility of establishing a period of 15 (fifteen) days for the payment of the tax, such period to start as of the date of remittance of the interest to the foreign creditors, on account of the complex calculation of the interest and consequently of the tax itself;

(c) the possibility of indicating "Brazilian Financing Plan" as the reference in space 31 of the DARF as there is no Certificate of Registration for these transactions;

(d) in the event that the withholding tax is paid late:

(i) whether the Central Bank would nevertheless be entitled to such pecuniary benefit;
(ii) whether it would be possible to waive the ancillary charges (default interest and monetary correction), particularly as regards the penalty.

(e) whether the position to be adopted by your Office can be extended to agreements of identical characteristics that may be executed in the future in a possible development of the present negotiation phase.

(7) Finally, we point out that the matter is of special importance for the completion of the mentioned Agreements.

Following the Central Bank's submission of the above ruling request, by around June or July 1983, certain employees of the Brazilian IRS prepared a proposed draft ruling which held that the Central Bank was required to pay withholding tax on its restructuring debt interest remittances to the foreign lenders during the relending periods of the DFA's and CGA's, because it was subject to the same withholding tax collection and payment rules that were applicable to non-public-sector entities (the Doniak-Kahan draft ruling). The Doniak-Kahan draft ruling was hotly debated within the Brazilian IRS and the Brazilian Government because of its conflict with SRF 368 and existing Brazilian Supreme Court decisions. As a result, Dornelles (the head of the Brazilian IRS) decided he could not approve the issuance of the Doniak-Kahan draft ruling to the Central Bank.

In about early January of 1984, Dornelles directed two top-level Brazilian IRS officials to redraft and revise the Doniak-Kahan draft ruling. He instructed them to reach the same holding as in the Doniak-Kahan draft ruling (i.e., that the Central Bank was required to pay withholding tax on its restructuring debt interest remittances to the foreign lenders during the relending periods of the DFA's and CGA's) but to keep their revised ruling within the provisions of SRF 368. In revising the Doniak-Kahan draft ruling, these two Brazilian IRS officials devised and formulated a new theory that the Central Bank was required to pay withholding tax on its restructuring debt interest remittances

during the relending periods of the DFA's and CGA's because until the expiration of the applicable relending period the loan funds were not yet irrevocably committed to the Central Bank, and it, therefore, had to pay withholding tax on behalf of future, unidentified "borrowers-to-be" (the borrowers-to-be theory). They incorporated this borrowers-to-be theory into the revised draft ruling they prepared, which revised draft ultimately became the final version of the ruling the Brazilian IRS issued to the Central Bank in March 1984.

By letter dated March 14, 1984, the Brazilian Finance Minister forwarded to the Central Bank's President the Finance Minister's decision on the ruling request and the ruling the Brazilian IRS had issued. The March 14, 1984, letter stated, in pertinent part:

> I refer to the inquiry made by your Bank regarding the tax treatment for the Agreements called * * * [CGA and DFA].
>
> 2. In this respect, I enclose a copy of the opinion of * * * [the Brazilian IRS] on the matter, as well as of the decision I issued on this date on account of the discussions I had jointly with you for the negotiation of such agreement.

The ruling issued to the Central Bank was a private ruling that was given limited circulation. The ruling was not made available to the public and was not published in the Brazilian Government's Official Gazette.

The Finance Minister's decision stated:

> Case No.:
> Interested Party:  CENTRAL BANK OF BRAZIL

DECISION: I agree fully with the conclusions of the attached opinion of the * * * [Brazilian IRS]. In view of item 13 of said opinion, I direct the Central Bank of Brazil to implement the payment of income tax on or before the last business day of the month following the month in which the withholding is made.

Brasilia, March 14, 1984

/Ernane Galveas/
ERNANE GALVEAS
Minister of Finance

The Brazilian IRS ruling, which he enclosed to the Central

Bank, stated:

Federal Government Service
Ministry of Finance
* * * [Brazilian IRS]


OPINION
Income tax withheld on interest due
to parties resident or domiciled
abroad

* * * [FIRCE] of the Central Bank of Brazil requests an opinion about the tax treatment of Agreements called * * * [CGA and DFA] under which such government agency [autarquia] is liable for the payments and remittances pertaining to them, in the period of availability of such funds for relending.

(2) By virtue of the special characteristics of these transactions, the question arises as to whether there is an incidence of income tax, in view of the government agency's [autarquia's] assumption of the burden, and if so whether,

(a) the DARF's may be issued in the name of the agent bank centralizing each project, considering that the large number of lenders makes it impractical to complete one DARF for each of them;

(b) the tax rates established in the treaties signed by Brazil to avoid double taxation may be applied;

(c) the pecuniary benefit * * * applies;

(d)   it is possible to establish another period for the payment of the tax, as from the date of remittance of the interest to the foreign lenders, because of the complex calculation of the interest and consequently of the tax itself;

(e)   it is possible, in space 31 of the DARF, to indicate "Brazilian Financing Plan" as a reference, given the absence of a Certificate of Registration for these transactions;

(f)   in the event that the income tax is paid late:

(f)(1)    whether the Bank will nevertheless be entitled to the above-mentioned pecuniary benefit;

(f)(2)    whether it would be possible to waive the monetary correction, delinquent interest and penalty.

(3)  Interest received by individuals or legal entities, resident or domiciled abroad, from individuals or entities resident or domiciled in Brazil, or received from a permanent establishment located in Brazil, owned by individuals or legal entities resident or domiciled abroad, is subject to withholding tax at the rate of 25% * * * . The * * * [contribuente] of this tax is an individual or legal entity, resident or domiciled abroad, which has the legal availability of the interest.  Said tax must be withheld at the time of payment or credit by the interest paying source bearing in mind that the * * * [contribuente] individual or legal entity, resident or domiciled abroad - does not file an income tax return in Brazil.  Said tax must be withheld even if the paying source is a legal entity of public law with tax immunity, because this is not a tax on the entity of public law that has immunity but rather on parties resident or domiciled abroad.

(4)  It is obvious that, if the party resident or domiciled abroad, the interest creditor, is immune or exempt from this tax, on account of international treaty or domestic legislation, the tax should not be withheld. In the case of the interest paid by the Central Bank of Brazil * * * , there is an atypical situation.  * * * [The Central Bank] is a federal government agency [autarquia] responsible, among other duties, for issuing currency, acting as depositary of the official gold and foreign currency reserves, providing for the placement of domestic and foreign loans, furthering the normal function of the exchange market, acting as a monetary

policy instrument of the Government and exercising control over credit in all its forms.

(5) The financial transactions conducted by * * * [the Central Bank] are, in general, conducted on behalf of the Federal Union or in its interest. In loan transactions, agreed upon with a net interest rate, the financial burden of the tax is transferred to the borrower. When the borrower assumes the tax burden, what actually happens is a gross-up of the income of the beneficiary lender. For this reason and in order to calculate the gross income obtained, the law determines that the basis of calculation of the tax - the amount of interest - be grossed up. In this way, the borrower pays the income tax to the Union on behalf of the lender, ensuring the net rate promised to the lender by means of the payment of a greater amount.

(6) Following the same reasoning, * * * it is possible to deduct, as an expense of a legal entity, the amount of tax incident on income tax paid to third parties, when the legal entity contractually assumes the burden as it is a supplemental expense and not a withholding tax.

(7) Now, when * * * [the Central Bank] acts on behalf of the interest of the Federal Union, in cases of transactions agreed upon with net interest rates, it could claim a reimbursement for the amount paid in the form of income tax. In reality, * * * [the Central Bank] would pay the tax to the Federal Union and the Federal Union could return it to * * * [the Central Bank]. Under this scenario, the payment of tax, as it would be a simple accounting transaction, could be waived.

(8) It should be noted that, as regards the possibility mentioned - loans of funds which must be relent to borrowers in Brazil - said Bank must, in substitution of the future not yet identified debtors of the tax, pay the income tax on the interest paid during the period in which the funds remained available for relending. The fact is that, since the loan benefits persons which have not yet been identified from whom the payment of withholding tax is stipulated law, * * * [the Central Bank] must in practice perform these acts on behalf of such persons.

(9) Considering, therefore, the peculiarity of the relationship * * * the Central Bank/Federal Union and

the Central Bank/Final borrowers of the relent funds, I believe that, as regards the funds that must be released to those as yet unidentified borrowers in Brazil, * * * [the Central Bank] must as a substitute for such borrowers pay the income tax incident on the interest from January 1, 1984 to the end of the period of availability for such funds to be relent.

(10) On account of the foregoing, there are the following consequences to the transactions in question:

(a) payment of withholding tax is due and the calculation base should be adjusted * * * [i.e., grossed-up];

(b) as there are innumerable lenders and income is received through an agent bank which will then distribute it, the DARF may be issued in the name of the agent to simplify the payment;

(c) if there is a Convention to avoid double income taxation signed with countries in which beneficiaries are domiciled, the rates established in the conventions shall be applied to that portion of the income corresponding to each;

(d) once the tax has been made, the pecuniary benefit * * * is applicable * * * ;

(e) in completing the DARF, the code to be used is code 0393 and, as no certificate of registration is issued in these transactions, "Brazilian Financing Plan" may be indicated in the appropriate space, as the reference to the certificate is merely a control requirement.

(11) As regards the delay in paying the tax not withheld, if the taxable event occurs while the inquiry is pending, the tax must be paid with monetary correction and without penalties * * * .

(12) As the term for payment of the tax is suspended, as far as the taxable events occurring while the inquiry is pending are concerned, as a consequence, the pecuniary benefit will be applicable in relation to the tax paid by the thirtieth day from the date of knowledge of the decision.

(13) As far as the extension of the tax payment period is concerned, this matter falls under the authority of the Minister of Finance * * * .

For higher consideration.

Brasilia,
/Eivany Antonio da Silva/
Assistant Secretary of  *  *  * [the Brazilian IRS]

I agree with the above Opinion, which I approve.
For the consideration of the Minister of Finance.
Brasilia,
/Luiz Romero Patury Accioly/
Acting Secretary of  *  *  *  [the Brazilian IRS]

R.  Foreign Lenders' Efforts During the Phase III Negotiations To Have the Central Bank Issue Them DARF's in Other Situations Not Covered in the March 1984 Brazilian IRS Ruling

During the phase III negotiations, a number of foreign lenders sought to have the Central Bank issue them DARF's with respect to all of its net loan interest remittances to them, and not just on its restructuring debt interest remittances during the relending periods of the DFA's and the CGA's.  The Brazilians rejected these efforts to have the Central Bank issue DARF's to the foreign lenders in additional situations outside the scope of the borrowers-to-be theory employed in the March 1984 Brazilian IRS ruling to the Central Bank.  However, the Brazilians did indicate some willingness to negotiate a longer relending period with respect to the proposed phase III DFA.

On January 5, 1985, the Brazilians submitted their written comments to a proposed draft of certain phase III basic business terms that had been prepared by the BAC.  Their comments with respect to the Central Bank's provision of DARF's were as follows:

WITHHOLDING TAX RECEIPTS

In the first place, Pricing and Withholding Tax Receipts are intimately linked and shall be dealt with altogether.

There is no room for any change as regards * * * [the Central Bank's] tax immunity. As on Phases I and II, withholding tax receipts shall only be provided to the creditors for the initial period during which the amounts remain deposited with the Central Bank for relending to borrowers in Brazil (Relending Period), based on the concept of "borrowers to be". No withholding tax shall be collected on amounts redeposited with the Central Bank as a result of the relending flexibility referred to above, as occurs with other similar deposits held by the Central Bank. Politically speaking, there is no ground for any material change in the Brazilian withholding tax system, when Mexico negotiated their debt rescheduling without having to make any change on their fiscal policies. In fact, around 75% (US $36 billion) of the total amount of debt to be rescheduled (US $48 billion) is exempt from withholding tax on the grounds of being considered governmental debt.

Furthermore, were the Central Bank to provide the creditors with tax receipts during the Relending Period, this would disencourage [sic] the relendings themselves, with negative consequences over the necessary regular flow of funds for the financing of the Public and Private Sectors. As to the subject of withholding tax on loans with Phase III funds, the possibility of determination of a higher limit (over 10 years) for withholding is under consideration and tax exemption shall be dealt with altogether with the level of spread. It must always be kept in mind that it is essential to keep in relation both the domestic interest rates and the financial costs of external borrowing. The increase in the latter will lead to an increase in domestic interest rates, in real terms, which is detrimental to the economic development and to the degree of freedom of monetary policies.

## S. Central Bank's Payment of Withholding Tax on Its Restructuring Debt Interest Remittances and the Caixa Unico System

In Brazil, Banco do Brazil, which among other things operated as a commercial bank, was the Brazilian National Treasury's agent for payment of taxes. During the years in issue, the Central Bank collected and paid over to Banco do Brazil, for the account of the National Treasury, withholding taxes, export taxes, taxes on financial operations, and social security taxes. The withholding

taxes the Central Bank collected and paid over included withholding tax on the salaries of its employees and withholding tax on its interest remittances to foreign lenders.

Prior to 1980, the Central Bank made tax payments to Banco do Brazil by issuing an administrative check. The check would be physically delivered to Banco do Brazil and then cashed through the normal check liquidation and payment procedure. Beginning in 1980, there was a change in the manner by which the Central Bank made tax payments to Banco do Brazil. Rather than issuing an administrative check, the Central Bank credited Banco do Brazil's Banking Reserves Account at the Central Bank with the amount of the tax payment.

By law, all commercial banks were required to maintain a Banking Reserves Account at the Central Bank with a minimum balance equal to 20 percent of their demand deposits. Banco do Brazil, however, was not subject to this requirement because the Central Bank would, on a frequent basis, credit and advance substantial funds to Banco de Brazil's Banking Reserves Account, due to the governmental functions and operations Banco do Brazil carried out.

Until 1965 when the Central Bank was formed, Banco do Brazil served as the country's sole monetary authority. During the times relevant to this case, Banco do Brazil was owned 51 percent by the Brazilian Government and 49 percent by private shareholders. From 1965 through 1986, Banco do Brazil had four primary functions: (1) A commercial bank, (2) a monetary authority, (3) management control and distribution of currency, and (4) responsibility for bank

clearing. Like the Central Bank, Banco do Brazil also functioned as: (1) A lender of last resort to public-sector entities, (2) a development bank responsible for various subsidized credit programs of the Brazilian Government, and (3) a fiscal authority that managed the Brazilian Government's budget. Together, Banco do Brazil and the Central Bank performed a number of governmental functions, including their unified management and operation of Brazil's monetary and financial system under what was known as the caixa unico system.[19]

To perform its various governmental functions, Banco do Brazil needed access to funds. Such funding was provided by the Central Bank. When Banco do Brazil, in carrying out its governmental functions, would draw down its Banking Reserves Account at the Central Bank below the legally required minimum level, the Central Bank would advance Banco do Brazil sufficient funds to replenish and maintain its reserves account at the required level. The Central Bank would level Banco do Brazil's reserves account on a daily basis. Banco do Brazil and the Central Bank each maintained a movement account in which they kept track of the funds the Central Bank advanced to Banco do Brazil.

The Central Bank financed the Brazilian Government's operations and the governmental functions that Banco do Brazil carried out, through its issuance of (1) Brazil's currency and (2)

---

[19] The Brazilian term "caixa unico" means a unified system of cash or financial management.

governmental securities in the name of the National Treasury. Essentially, the automatic transfer mechanism described above, whereby the Central Bank provided funds to Banco do Brazil through crediting its Banking Reserves Account, recognized and reflected that, under the caixa unico system, the Brazilian Government ultimately financed the governmental functions and operations Banco do Brazil and the Central Bank carried out.[20]

On its books, Banco do Brazil made entries reflecting the following: (1) Transfers of Central Bank tax payments to Banco do Brazil's Banking Reserves Account at the Central Bank, (2) collections of Federal Government tax receipts, and (3) deposits of Federal Government revenues payable upon demand to the National Treasury.

On the record presented in this case it is impossible to determine what entries were made on the respective books of the Central Bank and the National Treasury to reflect the Central Bank's payment of withholding tax on the restructuring debt

---

[20]    The record is not entirely clear whether daily surpluses or excess funds in the Banking Reserves Account were turned back over to Banco do Brazil or whether the Central Bank kept such surpluses in repayment of the funds it had advanced. When the caixa unico system was ended in 1987, the Central Bank was owed several billions of dollars by Banco do Brazil as a result of its advancement of funds to Banco do Brazil over the years. This liability of Banco do Brazil to the Central Bank, however, was offset by an equivalent liability that the National Treasury owed to Banco do Brazil. In ending the caixa unico system, a novation was effected whereby Banco do Brazil's liability to the Central Bank was canceled and the National Treasury directly assumed the previous liability that Banco do Brazil had owed to the Central Bank.

interest remittances.  We are unable to ascertain what, if any, entries were made to determine:  (1) Whether the Central Bank was reimbursed by the National Treasury for its withholding tax payments; or (2) whether the Central Bank received the pecuniary benefit based on those withholding tax payments.  The Central Bank's ruling request raised these two matters, and the March 1984 Brazilian IRS ruling discussed the two possibilities.[21]

Beginning in 1984, the Central Bank issued DARF's to the agent banks of the foreign lenders to whom it transmitted loan payments under the DFA's and CGA's, reflecting its withholding tax payments on restructuring debt interest remittances during the relending periods of the DFA's and CGA's.  From 1984 through 1988 the Central Bank issued a total of 324 DARF's to these agent banks.

T.  Foreign Tax Credit Claimed by Petitioner in Dispute Between The Parties

On its 1980 through 1986 income tax returns, petitioner generally reported its interest income and withholding tax payments with respect to its Brazilian loans on a cash basis.  Petitioner claimed a foreign tax credit and reported interest income gross-up when it received a DARF.  On its returns covering the period from 1980 through June 28, 1985, petitioner reduced the amount of

---

[21] An expert witness for petitioner acknowledged that the Central Bank might be entitled to reimbursement from the National Treasury for its restructuring debt withholding tax payments, as the Central Bank was acting on the Brazilian Government's behalf and in the national interest.  However, he claimed that the Central Bank would have to ask the Brazilian Government for reimbursement and that any such expenditure would require the Brazilian Congress' approval.

foreign tax credit it claimed in connection with its Brazilian loans by an amount equal to the pecuniary benefit provided by the Brazilian Government to Brazilian borrowers.

In its amended petition, petitioner asserted, among other things, that the foreign tax credit otherwise allowable to it for 1980 through 1986 should not be reduced by the pecuniary benefit provided to Brazilian borrowers.

The total foreign tax credit claimed by petitioner for 1980 through 1986 that is still in dispute between the parties, and the amounts of the disputed credit attributable to the legal liability, Central Bank, and subsidy/pecuniary benefit issues, are as follows:

| | | Issues | | |
|---|---|---|---|---|
| Year | Total Credit | Legal Liability | Central Bk | Subsidy/Pecuniary Benefit |
| 1980 | $53,358 | $53,358 | -- | $21,343 |
| 1981 | 545,462 | 545,462 | -- | 218,185 |
| 1982 | 814,969 | 814,969 | -- | 325,988 |
| 1983 | 489,341 | 489,341 | -- | 195,736 |
| 1984 | 312,353 | 312,353 | $166,415 | 124,941 |
| 1985 | 242,781 | 242,781 | 181,272 | 93,506 |
| 1986 | 355,679 | 355,679 | 317,019 | -- |

OPINION

Section 901 allows a domestic corporation to claim as a credit against its Federal income tax (subject to certain limitations not applicable herein) the amount of any income taxes paid on behalf of the taxpayer to a foreign country. Sec. 4.901-2(a), Temporary Income Tax Regs., 45 Fed. Reg. 75648 (Nov. 17, 1980); sec. 1.901-

2(a), Income Tax Regs.[22]  The purpose of the credit is to reduce international double taxation.  <u>American Chicle Co. v. United States</u>, 316 U.S. 450, 452 (1942).  U.S. tax principles are applied in deciding whether a foreign levy is a creditable income tax. <u>Goodyear Tire & Rubber Co.</u>, 493 U.S. 132 (1989); <u>Biddle v. Commissioner</u>, 302 U.S. 573 (1938); <u>United States v. Phillips Petroleum Co. v. Commissioner</u>, 104 T.C. 256, 295 (1995).  However, the law of the foreign state is first looked at to determine the nature of the obligations and rights which form the basis of the claim of a foreign tax credit.  Cf. <u>Phillips Petroleum Co. v. Commissioner</u>, <u>supra</u>; <u>H.H. Robertson Co. v. Commissioner</u>, 8 T.C. 1333 (1947), affd. 176 F.2d 704 (3d Cir. 1949).  Although prior cases involving other U.S. taxpayers' entitlement to foreign tax credits for Brazilian withholding tax paid on interest remittances to them have generally held the Brazilian withholding tax to be a creditable foreign income tax for purposes of section 901, e.g., <u>Continental Ill. Corp. v. Commissioner</u>, 998 F.2d at 518-519; <u>Nissho Iwai Am. Corp. v. Commissioner</u>, 89 T.C. at 773-774, none of those cases squarely dealt with the legal liability and Central Bank issues to be resolved by us <u>infra</u>.

_____

[22]     In November 1980, the Internal Revenue Service issued temporary regulations which set forth requirements for, and limitations on, the amount of foreign tax credit.  Secs. 4.901-2 to 4.903-1, Temporary Income Tax Regs., 45 Fed. Reg. 75647-75658 (Nov. 17, 1980).  These temporary regulations generally were made applicable to taxable years ending after June 15, 1979.  Final regulations under sec. 901 were made effective for taxable years beginning after Nov. 14, 1983.

I.  The Legal Liability Issue

A foreign tax is generally creditable for purposes of section 901 only if the domestic corporation is legally liable under foreign law for the tax.  Nissho Iwai Am. Corp. v. Commissioner, supra at 773-774; sec. 4.901-2(g), Temporary Income Tax Regs., 45 Fed. Reg. 75655 (Nov. 17, 1980); sec. 1.901-2(f), Income Tax Regs. However, it is recognized that legal liability for the tax and the obligation to pay are not necessarily the same.  For example, under a withholding system, legal liability for the tax and the obligation to pay the tax are different.   The Federal wage withholding system illustrates this difference--the employer is the person obligated to withhold the tax and to pay the withheld tax to the Government; the employee is the person legally liable for the tax.  Nissho Iwai Am. Corp. v. Commissioner, supra at 773.

To resolve the legal liability issue, we must examine Brazilian law.  In this regard, Rule 146 provides, in pertinent part:

> RULE 146. DETERMINATION OF FOREIGN LAW
>
>      *  *  *   The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or otherwise admissible.  The Court's determination shall be treated as a ruling on a question of law.

Rule 146 is taken almost verbatim from rule 44.1 of the Federal Rules of Civil Procedure.[23]  See Note to Rule 146, 60 T.C. 1137.

---

[23]    The 1966 Advisory Committee Notes to rule 44.1 of the Federal Rules of Civil Procedure, 28 U.S.C. app. at 759 (1994), state, in pertinent part:

The  *  *  *  new rule describes the materials to which the court may resort in determining an issue of foreign law.  Heretofore, the district courts, applying Rule 43(a), have looked in certain cases to State law to find the rules of evidence by which the content of foreign-country law is to be established.  The State laws vary; some embody procedures which are inefficient, time consuming and expensive.  *  *  *  In all events the ordinary rules of evidence are often inapposite to the problems of determining foreign law and have in the past prevented examination of material which could have provided a proper basis for the determination.  The new rule permits consideration by the court of any relevant material, including testimony, without regard to its admissibility under Rule 43.  *  *  *

*     *     *     *     *     *     *

In further recognition of the peculiar nature of the issue of foreign law, the new rule provides that in determining this law the court is not limited by material presented by the parties; it may engage in its own research and consider any relevant material thus found.  The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail.  On the other hand, the court is free to insist on a complete presentation by counsel.

*     *     *     *     *     *     *

The new rule refrains from imposing an obligation on the court to take "judicial notice" of foreign law because this would put an extreme burden on the court in many cases; and it avoids the use of the concept of "judicial notice" in any form because of the uncertain meaning of that concept as applied to foreign law.  *  *  *  Rather the rule provides flexible

(continued...)

A.  Non-Tax-Immune Borrowers/Liability Issue

In prior cases involving Brazilian withholding tax paid by non-tax-immune Brazilian borrowers on their net loan interest remittances to domestic corporations, we and other courts, including the U.S. Courts of Appeals for the Seventh and Eighth Circuits, have held those Brazilian withholding tax payments to be a potentially creditable tax to the domestic corporations for purposes of section 901.  As the Court of Appeals for the Eighth Circuit explained in Norwest Corp. v. Commissioner, 69 F.3d at 1407:

> The Commissioner argues that Norwest is not legally liable for the local [Brazilian] tax, and thus is not entitled to * * * [foreign tax credit] for the local tax, because only the borrower was legally obligated to withhold it. * * *
>
> We reject this argument as did the tax court below and the other courts which have addressed this question. See Continental Ill. Corp. v. Commissioner, 998 F.2d 513, 518-19 (7th Cir. 1993) (Continental) * * * ; Continental Ill. Corp. v. Commissioner, * * * [T.C. Memo. 1988-318], affd. sub nom. Citizens & S. Corp. v. Commissioner, 919 F.2d 1492 (11th Cir. 1990) (per curiam); Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765, 773-74 * * * (1987) (Nissho).  It is a well-settled principle under United States tax law that the person obligated to pay the tax is not necessarily the same person to whom legal liability attaches. Nissho, 89 T.C. at 773 * * * . Nissho, which the tax court here cites, compared the Brazilian system to the wage withholding system in the United States under which employees remain legally liable for income taxes, although the employer is the person obligated to withhold the tax and pay the tax to the government.  Id.  Similarly, the Brazilian

[23](...continued)
procedures for presenting and utilizing material on issues of foreign law by which a sound result can be achieved with fairness to the parties.

borrower is only charged with an administrative function. As explained, under Brazilian law, interest paid to foreign lenders like Norwest is subject to local tax. The Brazilian borrower is required to withhold the local tax from each interest payment. Id. at 774 * * * , citing Gleason Works v. Commissioner, 58 T.C. 464, 478 * * * (1972) (noting that liability for taxes "does not rest upon a search for the person from whom the tax is collectible but rather for the person upon whom the tax is imposed"). The Commissioner argues that in Brazil only borrowers have an enforceable legal obligation because withholding is the exclusive means of collection. The Commissioner's argument is unduly formalistic because Brazilian banking authorities will not allow the Brazilian borrower to buy foreign currency to pay interest to foreign lenders without proof it has withheld and paid the local tax. The lender thus could not escape liability and the absence of a law specifically applying to the lender is irrelevant. See Continental, 998 F.2d at 518. "[T]he [local] tax is 'paid' by the [foreign] lender * * * even if the [Brazilian government's] tax enforcement guns are trained on the agent [that is, the Brazilian borrower,] rather than on the principal [that is, the foreign lender]." Id. at 519. * * *

Based on the record presented in the instant case, we see no reason to depart from the above precedents. Brazilian law indisputably requires non-tax-immune Brazilian borrowers to withhold with respect to their interest remittances to foreign lenders. Petitioner is "legally liable" under Brazilian law for the withholding tax paid by non-tax-immune Brazilian borrowers on their net loan interest remittances to petitioner. We thus hold that the Brazilian withholding tax collected from and paid by these borrowers on their net loan interest payments to petitioner is potentially creditable to petitioner for 1980 through 1986. Of course, the actual amount of this withholding tax that is creditable to petitioner will depend upon our resolution of the subsidy/pecuniary benefit issue infra.

B.  Central Bank/Liability Issue

In the instant case, petitioner was not required to file a Brazilian tax return and had no obligation itself to pay Brazilian tax.  See Continental Ill. Corp. v. Commissioner, 998 F.2d at 518-519.  Brazilian withholding tax was purportedly collected from and paid by the Central Bank on its Brazilian restructuring debt interest remittances to petitioner during the relending periods of the DFA's and CGA's, beginning in 1984.  For these purported withholding tax payments to be a potentially creditable tax to petitioner, the Central Bank must have a legal liability under Brazilian law to pay this "withholding tax".  Petitioner cannot be considered "legally liable" under Brazilian law for Brazilian tax if there was no legal liability on its and the Central Bank's part to pay this "withholding tax". Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. at 773-774; sec. 4.901-2(g), Temporary Income Tax Regs., 45 Fed. Reg. 75655 (Nov. 17, 1980); sec. 1.901-2(f), Income Tax Regs.; see also Amoco Corp. v. Commissioner, T.C. Memo. 1996-159; Continental Ill. Corp. v. Commissioner, T.C. Memo. 1991-66 (hereinafter sometimes referred to as the PeMex case), affd. in part and revd. in part 998 F.2d 513 (7th Cir. 1993).

As we have determined in our findings, until 1984, the Central Bank paid Brazilian withholding tax on its gross loan interest remittances abroad, but not on its net loan interest remittances. This treatment was authorized and sanctioned by SRF 368, an "officio" that the head of the Brazilian IRS issued to the Central

Bank in June 1980, and was consistent with certain prior decisions of the Brazilian Supreme Court that are discussed more fully hereafter. Pursuant to SRF 368, the Central Bank (which in Brazil serves an instrumental role in ensuring that the withholding tax due on interest remittances abroad is collected), following its issuance of FIRCE 80 in May 1981, did not require withholding tax to be collected from and paid by public-sector entities, like itself, on their net loan interest remittances abroad. Beginning in 1984, the Central Bank purportedly paid withholding tax on its restructuring debt interest remittances during the relending periods of the DFA's and the CGA's, pursuant to the borrowers-to-be theory applied in the March 1984 Brazilian IRS private ruling issued to the Central Bank.

C. Brazilian Supreme Court Decisions

The following Brazilian Supreme Court decisions are apposite in understanding the respective arguments of the parties and their experts concerning the Central Bank's liability for the payment of withholding tax on its net loan interest remittances to foreign lenders.

On September 24, 1974, a panel of the Brazilian Supreme Court issued its unanimous decision in Federal Govt. v. Highway Dept. of the State of Parana (hereinafter referred to for convenience as the Parana I--1st Panel decision), reversing the decision of the lower Brazilian Federal Court of Appeals and holding that the State of Parana was required to pay withholding tax on its remittance of

interest abroad with respect to a loan to finance the construction of State highways, because it was not immune from paying this withholding tax under Article 19 of the Brazilian Constitution. The loan involved in the Parana I--1st Panel decision was a gross loan. The Brazilian Supreme Court Justice reporting the case reasoned that if constitutional immunity from the withholding tax were held to apply, then the beneficiary of the immunity would be the foreign creditor, not the State of Parana. This Justice quoted with approval the following reasoning given in the dissent to the lower Brazilian Federal Court of Appeals' majority decision:

> If the State of Parana were the beneficiary of an increase in its assets, on which the Union were demanding the tax, it would be granted immunity, according to the Constitution.

> But since it appears in a different capacity in the litigation, namely, as remitter of interest on behalf of another, I hold that the argument alluding to immunity is inadmissible.

On October 15, 1975, the full Brazilian Supreme Court issued its unanimous decision in State of Parana v. Central Bank (hereinafter for convenience referred to as the Parana II decision), holding the State of Parana was not required to pay withholding tax on its remittance of interest abroad with respect to a loan to finance a railroad, because it was immune from such withholding tax under Article 19 of the Brazilian Constitution. The loan involved in the Parana II decision was a net loan. The Brazilian Supreme Court Justice reporting the case distinguished the Parana I--1st Panel decision, and reasoned as follows:

There is no further debate on whether [withholding of] income tax can be demanded in the remittance of interest to another country, by virtue of art. 11, sole paragraph of Law-Decree 401, of 30 December 68, coupled with art. 1 of Law-Decree 1215, of 4 May 72, RE 76,792- Plenary Session (D.J. of 11 October 74, p. 7480), and I ruled this way in the RE 78,988-SP, on 18 March 75.

What is at issue, however, is the application of the sole paragraph of art. 11 of the Law-Decree 401/68, notwithstanding the immunity guaranteed to the remitter by virtue of art. 19, III, a, by the Federal Constitution.

The First Division, in RE 79,157 [the Parana I--1st Panel decision], held as follows:

> The tax is payable, even though the corporation * * * [by] constitutional law is immune, for otherwise the beneficiary of the immunity would not be the State, but the foreign creditor. * * *

I believe that the precedent invoked [the Parana I--1st Panel decision] does not apply to the present case. In fact it has been expressly stipulated that, at any time and for any reason, any fiscal or parafiscal [(i.e., tax)] burden shall be the responsibility of the State of Parana.

It is argued that said contractual provision * * * does not matter in the unraveling of the dispute, because the beneficiary of the interest would be the foreign creditor, which is not immune.

But such is not so, in my opinion, * * * because, according to the sole paragraph of art. 11 of * * * [Decree-law 401], the constitutionality of which also is not at issue, the creditor is not responsible for the payment of income tax.

The aforementioned sole paragraph states explicitly:

> "For purposes of this article, it is considered that the fact generating taxation is the remittance to another country and the remitter is the contribuente."

Now, in the present case, the generating fact is the remittance of interest on the loan owed by the State of

Parana, and the remittance being done, it is indisputable that it will be the contribuente.

However, the State is immune by virtue of art. 19 * * * of the Federal Constitution.

In my view, the conclusion is incontrovertible that the burden of the payment falls on the remitter, and in the present case, this, a unit of the Federation, is immune that is, not obligated to pay the tax.

There is no need to fear that the foreign creditor shall benefit from the immunity of the debtor.

In view of the sole paragraph of art. 11 of Decree-law 401 * * * , neither is the creditor of the interest abroad the contribuente, but rather the remitter, on occasion of the remittance.

In its February 21, 1979, decision in State of Minas Gerais v. Federative Republic of Brazil (hereinafter for convenience referred to as the Minas Gerais decision), the full Brazilian Supreme Court held that the State of Minas Gerais and its State Highway Department were not required to pay withholding tax on interest remittances they made as repass borrowers with respect to their Resolution 63 repass loans, because they were immune from such withholding tax under Article 19 of the Brazilian Constitution.[24]  The reporting Brazilian Supreme Court Justice

---

[24]  In Minas Gerais, the reporting Brazilian Supreme Court Justice stated:

Nowadays there is no further doubt on the subject, after * * * [Summula No. 586], establishing a position derived from art. 11 of Decree-law No. 401 of December 30, 1968 as follows:  "[Withholding of] Income tax is due on interest remitted abroad, based on a loan agreement."

We must thus now * * *  [address the other
(continued...)

reasoned that Resolution 63, which authorizes the repassing of the foreign loan, confers upon the repass borrower the status of a foreign currency borrower and concluded that the repass borrower could avail itself of its tax immunity.[25]  The Brazilian Supreme Court in Minas Gerais further held that certain mixed capital companies were required to pay withholding tax on interest remittances they made as repass borrowers with respect to their Resolution 63 repass loans, because these mixed capital companies did not enjoy immunity from taxation, as they have the same status under the Brazilian Constitution as private companies.[26]

On August 30, 1979, the full Brazilian Supreme Court issued its decision unanimously rejecting the objections of the State of Parana Highway Department in its appeal from the Parana I--1st Panel decision (hereinafter for convenience referred to as the

---

[24](...continued)
argument] invoked by the plaintiffs:  the remittances are from the State of Minas Gerais and thus [enjoy] the benefit of reciprocal tax immunity granted under art. 19  *  *  *  of the Constitution.

A "summula" is a statement of a legal proposition that the Brazilian Supreme Court feels is firmly established under Brazilian law.

[25]     In the case of a Resolution 63 repass net loan, the repass borrower generally must also provide the repass lender with the funds to pay the withholding tax on the repass lender's interest remittances to the foreign lender.  However, as noted in our findings, if the repass lender is entitled to a pecuniary benefit, the repass lender must then pass on the benefit to the repass borrower.

[26]     The Minas Gerais decision does not specifically state whether the Resolution 63 repass loans involved were net loans or gross loans.  However, see supra note 25.

Parana I--Full Bench decision).  The reporting Brazilian Supreme

Court Justice agreed with the Parana I--1st Panel decision's

reasoning that the remitter's immunity from taxation under Article

19 of the Brazilian Constitution should not prevent the imposition

of the withholding tax on gross loan interest remittances abroad,

because a contrary holding would allow the foreign creditor, and

not the State, to be the beneficiary of the immunity.  He concluded

by stating that "As this was the foundation of the challenged

ruling, and since this issue did not consider the ruling cited for

comparison, the claimed divergence does not exist in the present

case."[27]

On June 17, 1988, a panel of the Brazilian Supreme Court

issued its unanimous decision in Municipality of Santo Andre v.

Federal Union (hereinafter for convenience referred to as the Santo

---

[27]     An expert witness for petitioner, Joao Guerra (Guerra),
explained that the State Highway Department appealed the Parana
I--1st Panel decision to the full Brazilian Supreme Court because
the decision's holding appeared to conflict with the Parana II
decision's holding.  Although Guerra acknowledged that the
reporting Justice in Parana I--Full Bench concluded that there
was no actual conflict between the two decisions, Guerra
maintained that this did not necessarily mean the reporting
Justice accepted the Parana II decision's net-loan-versus-gross-
loan rationale.  Guerra claimed that (1) any points relating to
whether the particular loan in Parana I--Full Bench was a gross
loan or net loan may not have been brought to the Supreme Court's
attention, and (2) the reporting Justice may not have understood
the distinction between a net loan and a gross loan.  While we
agree that, in all likelihood, the Brazilian Supreme Court in
Parana I--Full Bench was aware of the holding it reached in
Parana II, we do not accept Guerra's other contentions.  If the
Highway Department's appeal were based on Parana II's holding, as
Guerra propounded, then the Supreme Court in Parana I--Full
Bench, in all substantial likelihood, would have had to have
considered Parana II's net-loan-versus-gross-loan rationale.

Andre I decision), holding that the municipality did not have to pay withholding tax on its interest remittances as repass borrower with respect to a Resolution 63 repass loan to construct a municipal supply center. The loan involved in the Santo Andre I decision was a net loan. The reporting Brazilian Supreme Court Justice noted the prior Parana I--1st Panel and Parana II decisions, but adopted and utilized the Parana II decision's rationale for distinguishing the Parana I--1st Panel decision. This Justice stated that the decision rendered in Santo Andre I was "oriented in the same line of jurisprudence" as the Parana II decision.

On April 13, 1993, a panel of the Brazilian Supreme Court issued its ruling not to recognize the Brazilian Government's appeal in Federal Union v. Municipal Prefecture of Santo Andre (hereinafter for convenience referred to as the Santo Andre II decision). The loan to the municipality in Santo Andre II was a Resolution 63 repass net loan. In its appeal, the Brazilian Government argued that the Parana II decision was distinguishable and did not support holding the municipality to be immune from payment of withholding tax, as the foreign loan in Parana II had been directly made to the State of Parana.

D.  The Parties' Experts

1. Petitioner's Experts.

Petitioner offered testimony on the applicable Brazilian law concerning the Central Bank's liability for withholding tax on its

restructuring debt interest remittances from four expert witnesses: (1) Geraldo Ataliba (Ataliba), a Brazilian university professor who specializes in constitutional taxation, (2) Eivanny da Silva (da Silva),[28] a Brazilian tax lawyer who served as a top-level Brazilian IRS official from 1982 through 1984 and was one of the principal authors of the March 1984 private Brazilian IRS ruling issued to the Central Bank, (3) Joao Guerra (Guerra), a Brazilian tax lawyer, and (4) Jose Pedreira (Pedreira), a Brazilian tax lawyer.

Petitioner's experts were of the opinion that the applicable Brazilian law with respect to the Central Bank's payment of withholding tax on its net loan interest remittances abroad was correctly presented in the Doniak-Kahan draft ruling that the Brazilian IRS never issued. In other words, they maintained that the Central Bank was subject to the same withholding tax collection and payment rules as non-public-sector entities and was required to pay withholding tax on all its interest remittances abroad, including those with respect to the restructuring debt, irrespective of the relending periods of the DFA's and CGA's.

They were further of the opinion that SRF 368 did not reflect the applicable Brazilian law and was completely insupportable under Brazilian law. Except for perhaps da Silva, all of petitioner's experts opined that, under Brazilian law, there was no such legal doctrine as the borrowers-to-be theory.

---

[28] Petitioner offered da Silva as both a fact witness and an expert witness on Brazilian law.

Even da Silva, the principal author of the March 1984 private Brazilian IRS ruling issued to the Central Bank, acknowledged that the borrowers-to-be theory was a "new theory" that he devised to deal with an "atypical situation".  He asserted that he and Luiz Patury Accioly (Patury Accioly), the other top-level Brazilian IRS official assigned by Dornelles to revise the Doniak-Kahan draft ruling, were trying to save face for and avoid embarrassment to the Brazilian IRS, because its prior issuance of SRF 368 lacked "any legal basis" under Brazilian law.[29]  According to da Silva, Patury Accioly (who was serving as a Brazilian IRS official when SRF 368 was issued) told him that SRF 368 had been issued by the Brazilian IRS because various States and municipalities did not want to be required to pay withholding tax on their net loan interest remittances abroad.  Most significantly, da Silva further related that the Doniak-Kahan draft ruling, at the time it was being hotly debated within the Brazilian IRS and the Brazilian Government, though supported by certain Brazilian Supreme Court decisions,

---

[29]  Da Silva attributed the Brazilian IRS's "illegal" actions in issuing SRF 368 to the fact that Brazil was under the control of a military regime.  As a result, he claimed, the executive branch of the Brazilian Government largely could do as it pleased.  The record, however, reflects that Brazil operated under this military regime until about 1985.  Thus, the March 1984 Brazilian IRS private ruling was issued to the Central Bank during this period of military rule.  Further, on cross-examination, da Silva acknowledged that Dornelles had no connection to the military regime.  More importantly, da Silva did not address the fact that the position taken in SRF 368 was consistent with the Brazilian Supreme Court's Parana II and Santo Andre I decisions.  The Santo Andre I decision was issued on June 17, 1988, a date well after the military regime had ended.  We find this aspect of da Silva's testimony not credible.

including the Parana I--1st Panel and Parana I--Full Bench decisions, was contrary to other Brazilian Supreme Court decisions, including the Parana II decision.

Petitioner's experts were of the opinion that certain Brazilian Supreme Court decisions, including the Parana II decision, holding that public-sector entities were not required to pay withholding tax on their net loan interest remittances abroad, were incorrectly decided. They maintained that these Supreme Court decisions improperly extended and applied the taxation principles of Decree-law 401 to foreign currency loans. Guerra claimed that the net-loan-versus-gross-loan rationale used in the Parana II decision to distinguish the Parana I--1st Panel decision was erroneous, but he acknowledged that this same rationale was applied and utilized in the Santo Andre I decision. He claimed that this was a repetition of the error.

Some of petitioner's experts were further of the opinion that Article 19 of the Brazilian Constitution would not prevent the Central Bank and other Federal-level autarquias from being subject to withholding tax on their net loan interest remittances, as Article 19 of the Constitution, they claim, prohibits taxation only between the different governmental levels. According to them, Article 19 prevents the Federal Government of Brazil from taxing the assets, revenues, and operations of State and municipal governmental entities, but not the assets, revenues, and operations

of other Federal-level governmental entities, like the Central Bank.

### 2. Respondent's Experts

Respondent offered testimony on the applicable Brazilian law concerning the Central Bank's liability for withholding tax on its restructuring debt interest remittances abroad from two expert witnesses: Paulo Bekin and Sergio Tostes. Both Bekin and Tostes were Brazilian lawyers.

Respondent's experts were of the opinion that the Central Bank was not required to pay withholding tax on its net loan interest remittances because of (1) its immunity from taxation under Article 19 of the Brazilian Constitution, and (2) its exemption from withholding tax under various ordinary laws, including Decree-law 1,215 and Decree-law 4,595 (under which the Central Bank is to enjoy the same privileges, immunities, and exemptions as the National Treasury).[30]

Tostes was of the opinion that the Central Bank was not required to pay withholding tax on its net loan interest remittances abroad, because of its immunity from taxation under Article 19 of the Brazilian Constitution. He claimed that Brazilian law distinguishes between net loans and gross loans, and that withholding tax would have to be paid by a public-sector

---

[30] The parties' experts agree that, in a strict technical sense, immunity from taxation derives from the Brazilian Constitution, whereas an exemption from tax typically is provided by an ordinary law.

entity, like the Central Bank, on its gross loan interest remittances abroad, but not on its net loan interest remittances. He cited as authority for this proposition the Brazilian Supreme Court's Parana II decision.

Bekin maintained that the Central Bank would not be required to pay withholding tax on interest from net loans because it would be granted exemption from payment of withholding tax under Decree-law 1,215. He believed that Decree-law 1,215 was the authority for the Brazilian IRS's issuance of SRF 368. However, on cross-examination, he acknowledged that, in 1983 and 1984, the National Monetary Council had set a minimum loan term of 10 years in order to qualify for exemption under Decree-law 1,215, whereas the phase I and phase II CGA's and DFA's had loan terms of less than 10 years. Both Bekin and Tostes were of the opinion that the Central Bank would be exempt under Decree-law 4,595 from payment of withholding tax with respect to its restructuring debt interest remittances, as the National Treasury, they maintained, would not have to pay withholding tax to itself if it, instead, had been the borrower under the DFA's and CGA's. They pointed out that Decree-law 4,595 provides that the Central Bank is to enjoy the same privileges and exemptions as the National Treasury. Tostes further noted that the March 1984 Brazilian IRS ruling issued to the Central Bank acknowledged that the Central Bank was acting as an agent for the National Treasury.

E.  Determination of the Applicable Brazilian Law

Petitioner contends that the applicable Brazilian law is correctly reflected in the Doniak-Kahan draft ruling which was never issued by the Brazilian IRS.  Petitioner asserts that Brazilian law does not distinguish between gross loans and net loans.  It further maintains that certain Brazilian Supreme Court decisions, like the Parana II decision, are distinguishable, because they involved financing of imported goods subject to Decree-law 401, not foreign currency loans.

Even if Article 19 of the Brazilian Constitution were applicable to public-sector entities' net loan interest remittances abroad, petitioner maintains that Article 19 prevents taxation only between the different governmental levels.  Thus, petitioner contends, while Article 19 might prevent the Brazilian Federal Government from taxing certain State-level and municipal-level autarquias (e.g., the Minas Gerais decision), Article 19 would not prevent the Central Bank and other Federal-level autarquias from being subject to withholding tax on their net loan interest remittances abroad.

Alternatively, petitioner maintains that this Court, pursuant to the act of state doctrine, must accord conclusive effect to the March 1984 Brazilian IRS private ruling issued to the Central Bank. As even petitioner's own experts generally acknowledged that the borrowers-to-be theory applied in the March 1984 Brazilian IRS

ruling did not reflect the applicable Brazilian law, we will deal with petitioner's act of state argument separately infra.

Respondent, on the other hand, primarily contends that public-sector entities, like the Central Bank, were not required to pay withholding tax on their net loan interest remittances abroad because of their immunity from taxation under Article 19 of the Brazilian Constitution. Respondent maintains that this was the applicable law in Brazil both before and after 1984, as reflected by the Brazilian IRS's issuance of SRF 368 in June 1980 and by certain Brazilian Supreme Court decisions, including the Parana II and Santo Andre I decisions. Respondent further asserts that these Supreme Court decisions involved foreign currency net loans, not net loans for the financing of imported goods. We agree with respondent.

The record reflects that to help meet the Brazilian Government's and the Central Bank's commitment to provide DARF's to the foreign lenders during the relending periods of the DFA's and CGA's, top Brazilian IRS officials concocted an elaborate legal fiction--the borrowers-to-be theory. In light of the States, municipalities, and other public-sector entities with foreign net loans, it was not politically feasible for the Brazilian Government to change the applicable Brazilian law and require all public-sector entities to pay withholding tax on their net loan interest remittances abroad. Moreover, as these public-sector entities, like the Central Bank, were immune from paying withholding tax on

their net loan interest remittances pursuant to Article 19 of the Brazilian Constitution, a constitutional amendment presumably would have been required to change the law. As a result, the Doniak-Kahan draft ruling was never issued.

Top Brazilian IRS officials, instead, devised the borrowers-to-be theory in an effort to (1) circumvent the Central Bank's tax immunity, and (2) limit narrowly the scope of the March 1984 private ruling eventually issued as to the Central Bank's interest remittances during the relending periods under the DFA's and CGA's, beginning in 1984. By doing so, their ruling would not directly conflict with existing Brazilian law and would have very little, if any, potential effect upon other net loan borrowings by public-sector entities.[31] Indeed, in January 1985, during the subsequent phase III negotiations, the Brazilians, in resisting the efforts of a number of foreign lenders to have the Central Bank issue DARF's with respect to all of its net loan interest remittances to them, advised the BAC that there was "no room for any change * * * [in the Central Bank's] tax immunity." The Brazilians noted, among other things, that about 75 percent of the total debt to be

---

[31] On cross-examination, da Silva testified that Dornelles, upon assigning him and Patury Accioly to revise the Doniak-Kahan draft ruling, instructed them to adhere to the "spirit of" the Doniak-Kahan draft ruling but to keep their opinion within the provisions of SRF 368.

restructured was "exempt from withholding tax on the grounds of being considered governmental debt."[32]

Petitioner's reliance upon Article 9 and Article 123 of the National Tax Code is misplaced. Article 9 generally provides that an entity's immunity or exemption from tax will not relieve it of its obligation to collect withholding tax that is due upon its

---

[32] We do not find credible da Silva's testimony that the entire technical staff of the Brazilian IRS believed that the Doniak-Kahan draft ruling accurately presented the applicable Brazilian law with respect to the Central Bank's net loan interest remittances abroad. Additionally, da Silva claimed that it was not necessary to publish the March 1984 ruling, because the Brazilian IRS's technical staff were well aware of the correctly applicable Brazilian law with respect to public-sector entities' net loan interest remittances abroad--presumably, as reflected in the Doniak-Kahan draft ruling that the Brazilian IRS never issued. We are not convinced by his explanation as to why the March 1984 Brazilian IRS ruling issued to the Central Bank was a private ruling. As an expert witness for respondent noted, although the decision to publish a Brazilian IRS ruling in the Brazilian Government's Official Gazette is discretionary, the March 1984 ruling's position represented such a drastic departure from existing law that, in his opinion, this ruling should have been published to provide public guidance--if the Brazilian IRS indeed was changing its interpretation and position with respect to the applicable law pertaining to public-sector entities' net loan interest remittances abroad. Da Silva was silent about what, if any, immediate efforts the Brazilian IRS took either to (1) revoke SRF 368, or (2) at minimum, publicize, prospectively apply, and enforce its alleged "new position" on the applicable Brazilian law concerning public-sector entities' net loan interest remittances abroad. We do not entirely understand petitioner's contention, on brief, that SRF 368 was revoked upon the Brazilian IRS's issuance of the March 1984 private ruling, as this private ruling applied only to the Central Bank, and not to other public-sector entities. See infra note 33. In fact, petitioner's failure to offer evidence concerning such Brazilian IRS actions to enforce the latter's alleged "new position", reasonably contemporaneous to its issuance of the March 1984 private ruling to the Central Bank, leads us to conclude that this evidence would have been harmful to petitioner's case. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

income remittances to third parties. Article 123 generally provides that private agreements concerning the liability to pay taxes are not binding upon the National Treasury. However, the National Tax Code is a complementary law and cannot override a public-sector entity's immunity from taxation under Article 19 of the Brazilian Constitution.

Similarly, petitioner's reliance upon certain "normative" rulings[33] that were issued by the Brazilian IRS from 1971 through 1974 is also misplaced. These rulings generally hold that immune or exempt entities are required to withhold with respect to their remittances of income to third parties. The rationale employed in these rulings is that although the remitter is immune or exempt from payment of Brazilian income taxes on its income, this immunity or exemption of the remitter does not extend to the beneficiary or recipient of the income. Thus, withholding taxes must be paid by the remitter on behalf of the recipient, unless the recipient of the income is itself immune or exempt from Brazilian income tax. However, these rulings were issued prior to October 15, 1975, and June 10, 1980, the respective dates upon which the Brazilian Supreme Court's Parana II decision and SRF 368 were issued.[34]

---

[33] Normative rulings are published in the Brazilian Government's Official Gazette and are intended to furnish guidance to and be applicable to the public at large. In contrast, the March 1984 Brazilian IRS ruling issued to the Central Bank was a private ruling that applied only to the Central Bank and not to other public-sector entities.

[34] The earlier rulings do not distinguish between gross

(continued...)

On brief, petitioner argues that the Brazilian Supreme Court decisions, like the <u>Parana II</u> decision, which hold that public-sector entities are not required to pay withholding tax on their net loan interest remittances abroad, are distinguishable. Petitioner maintains that these Brazilian Supreme Court decisions involved financing of imported goods covered under Decree-law 401, not foreign currency loans. Thus, it contends that these Supreme Court decisions are not applicable to the Central Bank's restructuring debt interest remittances, because the DFA and CGA loans to the Central Bank were foreign currency loans. However, some of petitioner's own experts agreed that the loans involved in these Brazilian Supreme Court cases were foreign currency loans. One of petitioner's experts further acknowledged that several of these cases involved repass loans under Resolution 63. See <u>infra</u> note 36. Indeed, in the <u>Minas Gerais</u> decision, the reporting

---

[34](...continued)
loan interest remittances and net loan interest remittances by the immune or exempt entities. However, the most recent of these rulings, CST Normative Opinion No. 193/74, which was issued on Oct. 25, 1974, dealt specifically with net loan interest remittances of tax-exempt foundations. This ruling noted that these foundations are generally subject to the same tax law rules as other private entities, except that certain legislation exempts them from income tax if prescribed requirements are met. It held that, notwithstanding their exemption from income tax, the foundations were still required to pay withholding taxes, even where they have contractually assumed the tax burden. This last ruling deals with foundations that are exempt pursuant to a provision of ordinary law and not with public-sector entities that are immune from taxation pursuant to Article 19 of the Brazilian Constitution. In the case of a foundation with an ordinary law exemption from income tax, Articles 9 and 123 of the National Tax Code may well apply to override the foundation's ordinary law exemption.

Justice reasoned that Resolution 63 conferred upon the public-sector entity/repass borrower the status of a foreign currency borrower.[35]

Petitioner's experts were of the opinion that those Brazilian Supreme Court decisions, like the Parana II decision, which hold that public-sector entities are immune from having to pay withholding tax on their net loan interest remittances abroad, were incorrectly decided. They maintain that the legal reasoning employed by the Brazilian Supreme Court Justices is technically wrong, because foreign currency loans, not import financing loans, were involved. According to petitioner's experts, Decree-law 401, by its terms, applies only to import financing loans, and not to foreign currency loans.[36] In our view, the crux of Parana II was

---

[35] It is further to be noted that pursuant to its receipt of SRF 368, the Central Bank issued FIRCE 80 and did not require public-sector entities to pay withholding tax on their net loan interest remittances abroad, regardless of whether such interest remittances originated from a currency loan or from financing for the importation of goods.

[36] Petitioner's expert Guerra testified, on cross-examination, as follows:

Q. All right. However, your view is inconsistent with at least some of the [Brazilian] Supreme Court cases that we discussed yesterday, correct?

A. No, I don't think it is because if you pay attention to the * * * [Parana I--1st Panel decision], it's--the quotation that I made says like-- is exactly that.

What you have there quoted from * * * [the dissent to the lower Brazilian Federal Court of Appeals' majority decision] is that if--were the state
(continued...)

---

[36](...continued)
of--were the state of Parana the recipient of the
interest on which the union would claim a tax, I would
recognize the immunity.  However, we are in a different
situation in this case in which the recipient of the
interest is a third party, and in this case the
immunity does not apply.

Q.  I wasn't particularly talking about the
  *  *  *  [Parana I--1st Panel and Parana I--Full
Bench decisions]; I was talking about some of the other
cases we discussed.

A.  Oh, the other, the two, I would say they
should be approached with two qualifications.  The
first one is that they all concern, except for one,
Resolution 63 loans, which is a different thing.  And
most important in that, none of these loans which were
dealt with in these other cases were import financing;
they were all, the three or the five of them, if you
compute all of them, straightforward currency loans.
And as we were discussing yesterday, the Decree Law
401, which the court applied or argued in all these
cases, only * * * [applies] to import financing and not
to currency loans.

That's the two main reservations or qualifications
that apply to these precedents of the Supreme Court.

Q.  So you acknowledge that the Supreme Court
cases we discussed yesterday did not involve import
financing, correct?

A.  Yes.  In the--my--the main criticism they may
be subject to is that although they do not involve
import financing, they apply one legal provision which
applies only to import financing.  That's the big
contradiction of these decisions, and that's their weak
point.

Q.  That's the reason you think the decisions are
wrong or you [are in] disagreement with them, right?

A.  Well, I disagree with them, yes.  Sure.

Q.  Okay.

(continued...)

the distinction it drew between a net loan and a gross loan in order to distinguish the previous holding reached in the Parana I--1st Panel decision.[37]  Although the Parana II decision cited and discussed the provision in Decree-law 401 that deems the borrower/remitter to be the contribuente where imported goods are purchased on an installment basis, that discussion was in rebuttal of the losing party's argument that the actual beneficiary of the interest was the foreign lender, not the State of Parana. Moreover, if the 1975 Parana II decision was incorrectly decided, as petitioner's experts claim, we then find it puzzling that, over the years, no successful challenge to its holding has been made, and that the Brazilian Supreme Court has continued to utilize and

---

[36](...continued)
    A.  Except for the  *  *  *  [Parana I--1st Panel and Parana I--Full Bench decisions], I do disagree.

    Q.  You disagree with all the ones that held the borrower was immune?

    A.  These are the ones.  They are not different ones.

[37]    Da Silva indicated in his testimony that he believed the Parana I--1st Panel decision involved a gross loan, whereas the Parana II decision involved a net loan.  Pedreira testified that the Parana II decision definitely involved a net loan. Guerra maintained that the Parana I--1st Panel decision possibly did not involve a gross loan.  He claimed that if the case involved a gross loan, there then would be no reason for the State Highway Department to litigate and dispute payment of the withholding tax, as a victory would not benefit the Highway Department but only the foreign lender.  However, Guerra did agree that the Parana II and Santo Andre I decisions involved net loans.  We note that both the Parana II and Santo Andre I decisions utilized a net-loan-versus-gross-loan rationale to distinguish the Parana I--1st Panel holding.

apply the case's net-loan-versus-gross-loan rationale in similar cases involving foreign currency loans.

The evidence reflects that this particular point petitioner's experts raise involves an area of Brazilian law in which there has been considerable controversy. Although Article 11 of Decree-law 401, by its terms, seems to be applicable only to import financing loans, even petitioner's experts acknowledge that Decree-law 401 and the 1972 Brazilian Supreme Court decision that upheld the law's validity have caused a great deal of confusion and generated controversy in the area. As petitioner's expert Gurerra related:

> some key legal principles in connection with the taxation of interest remitted by * * * [Brazilian borrowers] to * * * [foreign lenders]--namely the * * * [National Tax Code] definitions of taxable event, taxpayer, tax base and tax responsible and the scope of the * * * [constitutional] tax immunity--were neither adequately nor consistently applied by the * * * [Brazilian Supreme Court].
>
> * * * The source of this problem was * * * [the 1972 Brazilian Supreme Court decision that upheld the validity of Decree-law 401], while * * * [Article 11 of Decree-law 401 in defining the borrower remitting the interest abroad to be the contribuente] clearly violates the * * * [National Tax Code] definitions of taxable event and taxpayer; the majority opinions varied largely and did not express a precise understanding of the * * * [National Tax Code] on the main issues of the case. Subsequently, in addressing other cases dealing with these topics, the * * * [Brazilian Supreme Court] was confronted with its conclusion in * * * [its 1972 decision] and found no guidance in the varied opinions that had formed the majority in * * * [that precedent].

It is neither necessary nor appropriate for us to decide whether certain Brazilian Supreme Court decisions, including the Parana II decision, were technically "wrong" in part of their legal

reasoning because, as petitioner's experts assert, the Brazilian Supreme Court Justices failed to appreciate that Decree Law 401 applies only to import financing loans, not foreign currency loans.[38]  Of significance for our purposes in determining the applicable Brazilian law is that these Brazilian Supreme Court decisions, notwithstanding petitioner's experts' criticism of them, represent the Brazilian Supreme Court's legal position.  Over the years, the Brazilian Supreme Court, in Parana II and other similar cases involving foreign currency loans, has consistently held that public-sector entities, like the Central Bank, are immune from paying withholding tax on their net loan interest remittances abroad under Article 19 of the Brazilian Constitution.

We do not accept petitioner's contention that Brazilian law fails to distinguish between net loans and gross loans, in situations in which the borrower/remitter is a public-sector entity having an immunity from taxation pursuant to Article 19 of the Brazilian Constitution.  In addition to the expert testimony the parties have offered and the Brazilian Supreme Court cases discussed above, other evidence in the record confirms that the

---

[38]    We are hesitant to substitute our judgment on a matter of Brazilian law for that of the Brazilian Supreme Court Justices who reported these decisions.  In any event, this is a matter which we need not resolve, as in its subsequent decisions (which petitioners' experts agree involved foreign currency loans) the Brazilian Supreme Court has continued to utilize and apply Parana II's net-loan-versus-gross-loan rationale.  We further note that even the Brazilian Government and the Brazilian IRS appear to have attached little, if any, practical significance to the fact that the loans made to the Central Bank under the DFA's and CGA's were currency loans and not import financing loans.

Central Bank, under Brazilian law, was constitutionally immune from having to pay withholding tax with respect to its net loan interest remittances abroad. Pursuant to its receipt of SRF 368 from Dornelles (the head of the Brazilian IRS), the Central Bank, in May 1981, issued FIRCE 80 and did not require public-sector entities, like itself, to pay withholding tax on their net loan interest remittances abroad, regardless of whether the interest remittances originated from a currency loan or from an import financing loan. Da Silva (a fact witness, as well as petitioner's expert witness, and the author of the March 1984 Brazilian IRS private ruling issued to the Central Bank) essentially confirmed that, during 1983, when the Brazilian IRS's proposed issuance of the Doniak-Kahan draft ruling that conflicted with SRF 368 was being hotly debated within the Brazilian Government and the Brazilian IRS, certain existing Brazilian Supreme Court decisions, including the Parana II decision, supported the position taken in SRF 368. As a result of this debate, Dornelles decided that he could not approve the issuance of the Doniak-Kahan draft ruling to the Central Bank. Instead, in the March 1984 Brazilian IRS ruling that eventually was issued to the Central Bank, top Brazilian IRS officials contrived to get around the constitutional tax immunity of the Central Bank and other public-sector entities, through applying the novel borrowers-to-be theory. As indicated by the Brazilians' comments to the BAC in January 1985, during the phase III negotiations, although the Brazilians were willing to continue applying the

borrowers-to-be theory and to negotiate a longer relending period for the phase III DFA, they were unwilling to make any change in the Central Bank's tax immunity. In their comments, the Brazilians also advised the BAC that about 75 percent of the phase III debt to be restructured was not subject to withholding tax because it was governmental debt.

Lastly, we reject petitioner's contention that Article 19 of the Brazilian Constitution does not prohibit the Brazilian Federal Government from taxing the assets, revenues, and operations of Federal-level autarquias, like the Central Bank, as Article 19, petitioner maintains, precludes taxation only between the different governmental levels. Although some of petitioner's experts did give opinions to that effect, we agree with respondent's expert Tostes that such an interpretation of the constitutional tax immunity of public-sector entities is contrary to the provisions of Article 19, and is an unreasonable and questionable construction of Article 19.[39] If petitioner's interpretation of Article 19 were

_____

[39] Article 19 of the Brazilian Constitution provides, in pertinent part:

<u>Article 19</u>. The Union, the states, the Federal District, and the Municipalities, are forbidden to:

\* \* \* \* \* \* \*

III. Establish a tax on:

a. The assets, revenues, or services of one another.

\* \* \* \* \* \* \*

(continued...)

correct, then a Brazilian State would be free to tax the assets, revenue, and operations of other Brazilian States. Similarly, a Brazilian municipality could tax other Brazilian municipalities. Petitioner has cited no persuasive Brazilian legal authority for this proposition. We further note other convincing evidence of record. The Central Bank, following its issuance of FIRCE 80 in May 1981, did not require withholding tax to be collected with respect to the net loan interest remittances abroad of all public-sector entities, including "federal, state, and municipal autonomous governmental agencies". In January 1985, during the phase III negotiations, the Brazilians, in resisting the efforts of foreign lenders to have the Central Bank issue them DARF's and ostensibly pay withholding tax on all its net loan interest remittances abroad, advised the BAC that there was "no room for any change * * * [in the Central Bank's] tax immunity."

In our opinion, the applicable Brazilian law with respect to the Central Bank's restructuring debt interest remittances is as reflected in SRF 368[40] and in certain Brazilian Supreme Court

---

[39](...continued)
> Paragraph 1. The provisions of letter a of item III above extends to the autonomous governmental entities, as regards the assets, revenues, and services connected with their essential purpose or resulting therefrom * * *

[40] On brief, petitioner asserts that, to the best of its knowledge, "no banks lending to Brazil were aware of SRF 368 until March 18, 1994, when Respondent produced a copy in its
(continued...)

decisions, like the Parana II decision.  Consequently, we conclude that, under Brazilian law, public-sector entities, like the Central Bank, are not required to pay withholding tax on their net loan interest remittances abroad, because of their immunity from taxation under Article 19 of the Brazilian Constitution.

F.  The Act of State Doctrine

As indicated previously, we have determined that SRF 368 and certain Brazilian Supreme Court decisions, including the Parana II decision, correctly reflect the applicable Brazilian law that public-sector entities are not required to collect and pay over withholding tax with respect to their net loan interest remittances

---

[40](...continued)
Status Report filed on that date.  Respondent has never explained how or where she obtained SRF 368."  Petitioner also notes certain testimony of employees and representatives of various major international banks that the banks' Brazilian counsel had advised them that the Central Bank was required to pay withholding tax on its net loan interest remittances abroad.  The record does not support petitioner's assertion that none of the banks were aware of SRF 368 until Mar. 18, 1994.  Alexandre Leite, who headed Citibank-Brazil's tax division, testified that after the Central Bank's issuance of FIRCE 80 in May 1981, he concluded that Citibank would not be able to persuade the Central Bank to issue DARF's with respect to its 432 program net loan interest remittances.  He stated that with FIRCE 80 "there was a ruling from the tax revenue service  *  *  *  that any immune entity would not be obliged to  *  *  *  [issue withholding receipts in remitting interest]."  See supra note 12.  We thus do not believe that the major international banks, like Citibank, that were seeking DARF's with respect to the Central Bank's net loan interest remittances to them, much less these banks' Brazilian counsel, were unaware of SRF 368 until Mar. 18, 1994.  The record further fails to disclose what specifically the banks' Brazilian counsel told the banks or did not tell the banks with respect to SRF 368.

abroad.[41]   Petitioner, nevertheless, contends that the March 1984 Brazilian IRS private ruling issued to the Central Bank must be accorded conclusive effect under the act of state doctrine.   On brief, petitioner asserts:

>     Even if Respondent were correct and  *   *   *  [the March 1984 Brazilian IRS private ruling] represented a change in the   *   *   *  [Brazilian IRS's] historical position, this would not affect  *   *   *  [the March 1984 ruling's] validity.   *   *   *  [Respondent] regularly defends her ability to revise her rulings as necessary and appropriate in the circumstances.
>   *   *   *  Therefore, the  *   *   *  [Brazilian IRS would not have been required to follow an erroneous prior practice any more than  *   *   *  [respondent] would be required to follow such a practice.
>
>     *       *       *       *       *       *       *
>
>     Respondent's argument would require this Court to disregard  *   *   *  [the March 1984 Brazilian IRS ruling issued to the Central Bank] and the Minister of Finance's directive that taxes be withheld on the DFA and CGA interest payments.   Respondent argues that the *   *   * [Brazilian IRS] "compromised" Brazilian tax law, and that this Court must rule against the * * *[Brazilian IRS] on a question of Brazilian tax law.   Thus, Respondent invites the Court to violate the Act of State doctrine by "declar[ing] invalid, and thus ineffective as 'a rule of decision for the courts of this country,' the official act of a foreign sovereign." <u>W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp. Int'l.</u>, 493 U.S. 400, 405 (1990) *   *   *.

----

[41]     In <u>Amoco Corp. v. Commissioner</u>, T.C. Memo. 1996-159, we held that an Egyptian Tax Department determination reflected the applicable Egyptian law and rejected the Commissioner's argument that this Tax Department determination could have been successfully challenged.  We stated that whether the Tax Department's determination could have been successfully challenged was unclear, because, at the time, there was no existing precedent that focused on the precise issue involved. We further stated that, on the facts presented, we perceived no reason to delve into the motives of a foreign government in connection with its tax determinations.  The instant case is distinguishable from <u>Amoco</u>.

In the principal contemporary formulation of the act of state doctrine, the U.S. Supreme Court in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 428 (1964), stated:

> rather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

The act of state doctrine thus generally precludes judicial examination of the lawfulness of a taking by a foreign sovereign of property located in its territory, whether under the law of that foreign country, under international law, or under the law or policy of the forum. 1 Restatement, Foreign Relations Law 3d, sec. 443, cmt. d (1986).[42]

Although the act of state doctrine has predominantly been applied in cases involving a foreign sovereign's expropriation of private property, the doctrine has also been applied to other types of acts by foreign sovereigns. Id. cmt. c & reporter's note 7.

The burden of establishing the act and its character as an act of state is on the party invoking the doctrine. Republic of the Philippines v. Marcos, 806 F.2d 344, 356-357, 359-360 (2d Cir. 1986); 1 Restatement, supra sec. 443, cmt. i & reporter's note 3.

---

[42] The act of state doctrine is to be contrasted with the U.S. courts' well-established refusal to enforce a foreign country's penal or revenue laws. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 413-415 (1964); 1 Restatement, Foreign Relations Law 3d, sec. 443, cmt. i & reporter's note 10 (1986).

The act of state doctrine applies to acts such as constitutional amendments, statutes, decrees, and proclamations, and in certain circumstances, to physical acts. 1 Restatement, supra sec. 443, cmt. i & reporter's note 3.

In the instant case, the March 1984 Brazilian IRS ruling issued to the Central Bank was a private ruling. Petitioner's experts did not elaborate on whether the Central Bank, under Brazilian law, was legally compelled to accept and follow the ruling. Thus, it appears that the Central Bank possibly could have disputed that it was subject to withholding tax on its restructuring debt interest remittances during the relending periods of the DFA's and CGA's, and sought review in the Brazilian courts. In light of favorable existing Brazilian Supreme Court precedents, such as the Parana II decision, in all substantial likelihood, any effort by the Central Bank to dispute the ruling by resorting to the Brazilian judicial system would have been successful, particularly since even petitioner's own experts generally acknowledged that there was no such legal doctrine as the borrowers-to-be theory under Brazilian law. The borrowers-to-be theory itself contravened a number of rules of Brazilian taxation. The record further reflects that although Brazil was under a military regime until about 1985, the Brazilian courts still functioned during this period of military rule.[43] Moreover, the

_____

[43] Although petitioner's expert da Silva testified that SRF 368 was issued in June 1980, when Brazil was under a military
(continued...)

March 1984 private ruling still conflicted with SRF 368, despite the efforts of top Brazilian IRS officials, in devising the borrowers-to-be theory, to distinguish from SRF 368 the Central Bank's restructuring debt interest remittances during the relending periods of the DFA's and CGA's.[44]

We conclude that petitioner has failed to establish that the act of state doctrine is applicable. Petitioner has not shown that the March 1984 Brazilian IRS ruling was anything more than perhaps an administrative advisory opinion.[45] We are thus not required to accord conclusive effect to the March 1984 Brazilian IRS ruling issued to the Central Bank. Rule 142(a); <u>Republic of the Philippines v. Marcos</u>, <u>supra</u>.

G. Conclusion

We hold that the Central Bank was not required, under Brazilian law, to pay withholding tax on its restructuring debt

---

[43](...continued)
regime, he also indicated that the Brazilian courts had more leeway than the Brazilian Congress. He related that Brazil had been under this military regime from 1964 through March 1985. We note that the Brazilian Supreme Court's <u>Parana II</u> and <u>Minas Gerais</u> decisions were issued, respectively, in 1975 and in 1979, during this period when Brazil was under military control.

[44] As indicated above, the record does not reflect that the Brazilian IRS ever revoked SRF 368. See <u>supra</u> note 32.

[45] Although the Finance Minister "directed" the Central Bank to begin "paying" this "withholding tax" by the last business day of the month following the month in which the Central Bank started "withholding", his action was merely in response to the Central Bank's request, in the consulta, that it be granted a waiver of any late payment "penalties", as only the Finance Minister had the authority to extend the time for "payment" and to waive such "penalties".

interest remittances to petitioner during the relending periods of the DFA's and CGA's. Petitioner is thus not "legally liable" for these alleged Central Bank "withholding tax payments". Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. at 773-774; sec. 1.901-2(f), Income Tax Regs.; see the PeMex case.

## II. Central Bank Issue

Our holding on the Central Bank/liability issue requires us to decide the Central Bank issue against petitioner. As petitioner is not "legally liable" for the Brazilian tax, we hold that the "withholding tax" purportedly paid by the Central Bank on its restructuring debt interest remittances to petitioner is a noncompulsory amount and not a tax to Brazil under section 1.901-2(e)(5), Income Tax Regs., and is not creditable to petitioner. Sec. 1.901-2(e)(1), Income Tax Regs. Petitioner has not argued that, even if these alleged withholding tax payments were not required and exceed the amount of petitioner's actual Brazilian tax liability, they are still potentially creditable to petitioner pursuant to section 1.901-2(e)(5)(i), Income Tax Regs.[46] We do not

---

[46] The regulations provide relief, in certain limited circumstances, to taxpayers who reasonably interpret foreign law but overpay their actual foreign tax liability. Among other things, the amount of foreign tax paid must be determined by the taxpayer in a manner that is consistent with a reasonable interpretation and application of the substantive and procedural provisions of foreign law. Further, an interpretation of foreign law is not considered reasonable if there is actual or constructive notice (e.g., a published court decision) to the taxpayer that the interpretation is likely erroneous. Also, while a taxpayer generally may rely on advice obtained in good faith from competent foreign tax advisers, the taxpayer must have

(continued...)

decide whether these alleged withholding tax payments, in fact, were made by the Central Bank.[47]

---

[46](...continued)
disclosed to them the relevant facts. See sec. 1.901-2(e)(5)(i), Income Tax Regs. In any event, on the record presented in the instant case, petitioner has failed to establish it would be eligible for such relief. As previously discussed, petitioner's assertion that no banks lending to Brazil were aware of SRF 368 until Mar. 18, 1994, is untrue. We do not believe that certain major international banks, like Citibank, much less these major international banks' Brazilian counsel, were unaware of SRF 368 and the Brazilian Supreme Court's Parana II decision. See supra note 40. Moreover, notwithstanding the March 1984 Brazilian IRS private ruling issued to the Central Bank, even some of the employees and representatives of these major international banks who testified at trial indicated that they were skeptical of the ruling's borrowers-to-be theory.

[47] The parties disagree over whether the Central Bank actually paid "withholding tax" on its restructuring debt interest remittances to foreign lenders during the relending periods of the CGA's and DFA's, beginning in 1984. At trial, petitioner offered the testimony of an employee of Banco do Brazil, the Brazilian National Treasury's agent for payment of taxes. The Banco do Brazil employee was offered by petitioner as an expert witness with respect to the manner in which Banco do Brazil accounted for its withholding tax payment collections. He examined one purported withholding tax payment of the Central Bank on its restructuring debt interest remittances, which he selected at random, and verified that certain entries had been made on Banco do Brazil's books reflecting Banco do Brazil's receipt of the Central Bank's purported withholding tax payment. However, as we noted in our findings, it is not known: (1) Whether the Central Bank was reimbursed by the National Treasury for its restructuring debt "withholding tax payments", or (2) whether the Central Bank received the pecuniary benefit based on such "withholding tax payments". Petitioner's expert acknowledged that he had not inquired into whether the Central Bank received the pecuniary benefit or whether any other transactions took place resulting in a "refund" being made of the Central Bank's "withholding tax payments". Although we do not decide the payment issue, the Central Bank's actual receipt of the pecuniary benefit would be highly probative evidence confirming its actual payment of this "withholding tax". If the Brazilian Government reimbursed the Central Bank for these "withholding tax payments", because the Central Bank was acting
(continued...)

III. Subsidy/Pecuniary Benefit Issue

Section 4.901-2(f)(3), Temporary Income Tax Regs., 45 Fed. Reg. 75653-75654 (Nov. 17, 1980), provides:

(f) Amount of income tax paid or accrued-(1) In general. A credit is allowed under section 901 for the amount of income tax * * * that is paid or accrued to a foreign country, subject to the provisions of paragraph (f). The amount of income tax paid or accrued is determined separately for each taxpayer.

* * * * * * *

(3) Subsidies-(i) General rule. An amount is not income tax paid or accrued to a foreign country to the extent that-

(A) The amount is used, directly or indirectly, by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and

(B) The subsidy is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer.

(ii) Indirect subsidies. A foreign country is considered to provide a subsidy to a person if the country provides a subsidy to another person that-

(A) Is owned or controlled, directly or indirectly, by the same interests that own or control, directly or indirectly, the first person; or

(B) Engages in a business transaction with the first person, but only if the subsidy received by such other person is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the first person with respect to such transaction.

---

[47](...continued)
as the Brazilian Government's agent, then the Central Bank, in all likelihood, would not receive the pecuniary benefit based on such "tax payments".

Substantially identical provisions are made in section 1.901-2(e)(3), Income Tax Regs.

Pursuant to section 4.901-2(f)(3)(ii), Temporary Income Tax Regs., supra, and section 1.901-2(e)(3)(ii), Income Tax Regs., the existence of an indirect subsidy does not depend upon a finding that the U.S. taxpayer derived an actual economic benefit. It is sufficient that another person who engages in a transaction with the U.S. taxpayer has received a subsidy that was based on the amount of tax paid. Norwest Corp. v. Commissioner, 69 F.3d at 1409-1410; Continental Ill. Corp. v. Commissioner, 998 F.2d at 519-520; Bankers Trust New York Corp. v. United States, 36 Fed. Cl. 30 (1996). Thus, subsidies received by Resolution 63 repass lenders and repass borrowers also fall "within the letter as well as the spirit of" the indirect subsidy provision of the temporary and final regulations, as the repass lender is required by Brazilian law to pass along the pecuniary benefit to the repass borrowers. Norwest Corp. v. Commissioner, 69 F.3d at 1410; Continental Ill. Corp. v. Commissioner, 998 F.2d at 520, affg. on this issue T.C. Memo. 1988-318; Bankers Trust New York Corp. v. United States, supra at 36. Further, this Court and other courts, including the U.S. Courts of Appeals for the Seventh and Eighth Circuits, have upheld the validity of the indirect subsidy provision of the temporary regulations, and have held that U.S. taxpayer-lenders are required to reduce the amount of their potentially creditable Brazilian withholding taxes by the pecuniary benefit the Brazilian

Government provided to their Brazilian borrowers. <u>Norwest Corp. v. Commissioner</u>, 69 F.3d at 1408-1410; <u>Continental Ill. Corp. v. Commissioner</u>, 998 F.2d at 519-520; <u>Nissho Iwai Am. Corp. v. Commissioner</u>, 89 T.C. at 775-777 (1989); <u>Bankers Trust New York Corp. v. United States</u>, <u>supra</u> at 35.[48]

Petitioner argues that the "subsidy * * * to the taxpayer" language in the temporary and final regulations requires an economic benefit analysis and asserts that petitioner itself received no economic benefit from the pecuniary benefit the Brazilian Government provided to Brazilian borrowers. Petitioner points out that, in the case of Resolution 63 repass loans, it did not even know the identity of the repass borrowers who received the pecuniary benefit. It contends that if the regulations are applied to require reduction of the Brazilian withholding tax potentially creditable to petitioner by the pecuniary benefit the Brazilian borrowers received, then the regulations are invalid. We disagree.

We hold that pursuant to section 4.901-2(f)(3)(ii), Temporary Income Tax Regs., <u>supra</u>, and section 1.901-2(e)(3)(ii), Income Tax Regs., the Brazilian withholding tax potentially creditable to petitioner must be reduced by the pecuniary benefit the non-tax-immune borrowers received. We further hold that the indirect

---

[48] The position set forth in the temporary and final regulations has been codified in sec. 901(i), which is effective for foreign taxes paid or accrued in taxable years beginning after Dec. 31, 1986. Tax Reform Act of 1986, Pub. L. 99-514, sec. 1204(a), 100 Stat. 2532; see <u>Nissho Iwai Am. Corp. v. Commissioner</u>, 89 T.C. at 777 n.17.

subsidy provisions of the temporary and final regulations are valid. <u>Norwest Corp. v. Commissioner</u>, 69 F.3d at 1408-1410; <u>Continental Ill. Corp. v. Commissioner</u>, 998 F.2d at 519-520; <u>Nissho Iwai Am. Corp. v. Commissioner</u>, <u>supra</u> at 775-777. In light of our holdings on the legal liability and Central Bank issues (i.e., that the "withholding tax" purportedly paid by the Central Bank on its restructuring debt interest remittances to petitioner is not a potentially creditable tax to petitioner), we need not reach the issue of whether any pecuniary benefit the Central Bank received represents an indirect subsidy for purposes of section 1.901-2(e)(3)(ii), Income Tax Regs. Compare the <u>PeMex</u> case with <u>Amoco Corp. v. Commissioner</u>, T.C. Memo. 1996-159.

To reflect concessions by the parties,

<u>Decision will be entered under Rule 155</u>.